Keating, J.
On November 8, 1963, a Harlem River drawbridge operator spotted a body later identified as Rubin Markowitz, a book-maker, floating in the river. The last-known contact with the deceased was a telephone call from him at 4:00 p.m. on October 10, 1963. Death was caused by four .22 caliber bullet wounds.[1]
The defendant is a businessman with a wife and three children living in comfortable circumstances but also addicted to gambling and association with prostitutes. He maintained an apartment on 63rd Street under the fictitious name of “ Weiss-man ” for his extramarital activities and contributed large amounts to the support of a prostitute known by numerous aliases but hereinafter referred to as Gloria Kendal. Gloria, who procured entertainment for defendant’s friends as well as engaging in prostitution herself, was the primary witness for the prosecution.
In essence, her testimony — and the People’s case — was that, sometime after 5:00 p.m. on October 10, 1963, defendant telephoned her (Gloria lived on 73rd Street) from the Weissman apartment and urgently requested her presence. She complied and upon her arrival he exhibited a trunk, admitting that he had shot his book-maker, to whom he owed money from the recent World Series, and stuffed the body into the trunk. After defendant pleaded for her assistance, Gloria called a friend, *168 David Broudy, who immediately left his Bronx apartment. In the meantime she asked defendant if he was sure Ruby was dead. Defendant allegedly responded in the affirmative and lifted the trunk lid exposing part of an arm, some new clothesline and some white material that looked like a shirt.
In addition to Broudy, a Miss Geri Boxer, who was to have picked Gloria up at the latter’s apartment but was told by one Sandra Ede that Gloria was at the Weissman apartment, appeared at the apartment. These two, along with Gloria, loaded the trunk into a station wagon rented by defendant and drove to Gloria’s apartment. Gloria went inside for awhile and then returned to the others outside. The three then drove around, finally stopping on Harlem River Drive and throwing the trunk into the river. Gloria also threw in two duffle bags, one of which contained pieces of carpet from the apartment.
Defendant was convicted upon a jury verdict of murder in the second degree and sentenced to State prison for 30 years to life. After a full posttrial hearing, defendant’s motion for a new trial was denied. The Appellate Division affirmed the judgment.
Defendant’s contention that the use of a special jury deprived him of his constitutional right to a fair trial has been considered before and found to be without merit. (Fay v. New York, 332 U. S. 261; Moore v. New York, 333 U. S. 565.)
Similarly, the record fails to support defendant’s claim that unfavorable publicity aroused such prejudice in the community that he was deprived of a fair trial. The publicity in question for the most part took place at the time of arrest, nearly eight months prior to trial. Defendant’s own counsel argued on a habeas corpus hearing four months prior to trial that the effect of publicity had long since passed and defendant was ready to go to trial. Finally, defendant never even sought a change of venue. (See Stroble v. California, 343 U. S. 181.)
Defendant next urges that the seizure by police of a chair from a warehouse and its introduction into evidence violated his constitutional rights. The chair in question had been in the Weissman apartment at the time of the murder. The serologist who examined and tested the chair reported that signs of human blood were present on the chair. However, there were insufficient stains present to group or type the blood.
*169 We find that even if this objection was properly preserved it has no merit. The facts show that defendant voluntarily relinquished all right, title and interest to the chair with an intention of terminating forever his ownership in it. Defendant abandoned his interest and retained no rights in the chair which could be breached by its subsequent seizure by law enforcement officers.
Defendant also argues that the Appellate Division abused its discretion in failing to consider his appeal from the denial of his motion for a new trial on the ground of newly discovered evidence. It is clear, however, from the opinion of the Appellate Division (24 A D 2d 32) that the alleged newly discovered evidence was fully considered by the court and found insufficient to warrant a new trial.
Moreover, it is well settled that this court has no power in a noncapital case to review the discretionary order denying a motion for a new trial. The right to a review of such an order ceases at the Appellate Division. (People v. Bonifacio, 190 N. Y. 150; People v. Luciano, 275 N. Y. 547; People v. Girardi, 303 N. Y. 887; People v. Mistretta, 7 N Y 2d 843, 844.)
Although the evidence brought out at the posttrial hearing-on the motion for a new trial would, therefore, not normally be before us, since the hearing was so complete and extensive evidence was taken, much of which could be considered on a coram nobis, we have considered the merits of defendant’s evidence.
The only serious question which arises from this evidence concerns defendant’s contention that facts brought to light at the posttrial hearing establish a failure of the prosecution to disclose material exculpatory evidence, thus denying defendant a fair trial. Specifically, defendant points to four instances of alleged suppression: the ballistics report of Detective Kelly, the testimony of Sandra Ede, the testimony of Mrs. McNair and Mrs. Bennett, and the testimony of Mrs. Generazio.
The objection in the first instance has little substance. The Kelly report of an inconclusive naked eye examination was in no way contradictory to, but was fully superseded by, the microscopic examination and analytic tests by Detective 0 ’Brien who testified and was subject to cross-examination. Both the 0 ’Brien report and the Kelly report were in the physical possession of the court during the entire trial pursuant to a subpoena by *170 defendant and were fully available to defendant. In short, there was neither suppression of evidence nor was the evidence in question exculpatory. (See Jordon v. Bondy, 114 F. 2d 599, 602.)
Similarly, the testimony of Sandra Ede, a prostitute who spent a good deal of time in Gloria’s apartment and frequently took messages, was in no way suppressed. Sandra, who was under psychiatric care when she testified at the posttrial hearing, consistently advised all representatives of the prosecution that she could not recollect the events of October 10, 1963.
Faced with an unstable and uncertain witness, whose testimony would add nothing’ to his case, the prosecutor cannot be faulted for choosing not to call her to the stand. However, he did the next best thing in providing the defense with the information. At the close of his case, the District Attorney in open court recalled who Sandra was and stated that, since she claimed to have no recollection, he was not calling her to the stand. He then gave her name and address to defense counsel so they could do whatever they wanted with it. Defense counsel, who already knew about Sandra, chose not to call her either. Clearly, evidence is not suppressed when the defendant has such a knowledge of it.
Mrs. McNair and her daughter Mrs. Bennett lived two floors below the Weissman apartment. Defendant claims that their testimony, that they heard shots from the rear of the building (the Weissman apartment was towards the front) on the day of the murder, was suppressed by the People. Again, the questions are presented as to whether there was suppression and whether the evidence was exculpatory.
Mrs. Bennett told the investigators that she dated Mr. Kassow (one of the original lawyers for defendant) and had told him of hearing the shots and of seeing a trunk in the apartment lobby prior to the murder. Mi*. Kassow himself testified that Mrs. Bennett had told him of seeing the trunk but when he asked her if she had heard any shots she replied in the negative.
The testimony is conclusive that, regardless of what Mrs. Bennett actually told Mr. Kassow, the District Attorney had no reason to believe that he knew anything that defendant did not know. Moreover, the trial court found, and we concur, that these women possessed no exculpatory evidence. The prosecutor and Detective Leman testified that the women told them by *171 word and hand gestures that the shots had come from up and towards the front of the building*, which corresponded to the Weis smart apartment. The women had little knowledge of guns or gunshots yet they claimed to have heard from the alley three floors below — through an open window — four very loud sounds which scared them and which they were certain came from a gun; this despite the fact that .22 caliber shots make a comparatively small report. The words of the Trial Judge, who had an opportunity to observe these witnesses, best sum up their testimony: ‘ ‘ Taking their credible testimony in the most favorable light, each testified that some time in late September or early October 1963, they heard four to six loud noises which came through their living room window * * * late in the afternoon. I find no basis for believing that they recognized the sounds as gunshots, partly because Mrs. Bennett long ago denied hearing shots when questioned by the defendant’s first attorney of record, Mr. Kassow, and partly because of their lack of expertise. Mrs. Bennett’s recollection that she only discussed having seen a large steamer trunk in the lobby of the building during the same period — but not the ‘ shots ’ because of the trial assistant’s request that she not discuss it with anyone, is completely inconsistent with her demeanor at the hearing. This voluble witness was simply incapable of restricting her desire to talk.”
The Judge further noted that they misdated their interview by several months, failed to remember their description of the trunk from one week to the next, and that the only probable explanation for inconsistencies in various testimony was that they told the prosecutor an entirely different story from that which they recollected at the hearing. The prosecutor, having been told by the witnesses that defendant’s attorney was informed and the information being at best very tenuous, could not be expected to come forward with the pointless task of repeating that information.
The defendant’s claims with regard to Detective Kelly, Sandra Ede and the Bennett-MoNair testimony are perfect examples of why the public prosecutor — an experienced trial lawyer — must have some area in which he is permitted to judge, in the context of the entire case, the value of evidence to the defense in terms of its potential impact on the jury; he must have some discretion in determining which evidence must be turned over *172 to the defense. These claims are examples of why no conrt has ruled that every statement obtained by the District Attorney or the results of every avenue of investigation pursued by him must be disclosed to the defense regardless of its materiality, credibility or potential impact on the trier of fact. As Judge Hastie has stated in a frequently cited passage (United States ex rel. Thompson v. Dye, 221 F. 2d 763, 769 [3d Cir., 1955], cert. den. 350 U. S. 875), there are many situations in which a prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false. But there are other circumstances in which a prosecutor should know that even testimony which he honestly disbelieves is of a type which in all probability would make it very persuasive to a fair-minded jury. It is not every case in which the prosecution must reveal the availability of testimony inconsistent with government contentions, but in special circumstances nondisclosure may amount to fundamental unfairness in a criminal trial.
With regard to Mrs. Dagmar Finch Generazio, defendant claims not only the suppression of her testimony but also the countenancing by the prosecution of false testimony by two of its witnesses regarding a confrontation between Gloria and Dagmar preceding a recantation by Gloria. He argues that this additional fact of false and perjurious testimony automatically requires a new trial under our decision in People v. Savvides (1 N Y 2d 554).
Dagmar Finch Generazio was a prostitute friend of Gloria Kendal whom Gloria allegedly called on the day of the murder seeking a car to move a box. During the investigation Dagmar told the prosecution varying stories as to the time she received the call but mainly told them that it was after 6:00 p.m. She had claimed to be in Gloria’s apartment that afternoon to meet a man but, when he did not appear, she left around 4:00 p.m. According to her story she went to Gail Weiner’s apartment (where she allegedly received the call) arriving there between 6:00 p.m. and 7:00 p.m. At the posttrial hearing, however, she testified that she was in Gail’s apartment and was certain she received Gloria’s call there between 3:00 p.m. and 4:00 p.m.
At the close of Gloria’s direct testimony, the prosecutor called defense counsel to the bench and there made a statement for the record. In this statement he explained that twice in the *173 course of Iris investigation Gloria liad recanted lier testimony about hearing defendant admit the shooting and seeing the body in the trunk. The first recantation does not concern us as there is no question raised concerning it. With regard to the second, the prosecutor said that on September 28, 1964, in his office, Gloria had recanted and on September 30 she said she had lied two days previously. This information was provided so that defense could cross-examine Gloria about it.
It appears that prior to the second recantation Dagmar had been brought to the District Attorney’s office and there confronted Gloria with the story that Gloria had called Dagmar at Gail’s apartment some time between 6:00 p.m.- and 7:00 p.m. or possibly later. Gloria denied the call, called Dagmar a liar and then started yelling and screaming that Detective Leman was getting people to lie about her. The detective took Dagmar from the room and Gloria demanded to call her lawyer. Thereafter Gloria recanted for the second time and it is with regard to these circumstances that the defendant charges the prosecution with countenancing false testimony.
In the first place, the record amply sustains the finding of the court below that the testimony in question was not in fact false or perjurious (see 24 A D 2d 42). While it may be that Gloria and Detective Leman failed to disclose the presence of Dagmar prior to Gloria’s recantation, nowhere in their testimony can we find statements actually false or perjurious.
Moreover, the mere labelling of testimony as “false” does not change the nature of the inquiry and require an automatic reversal. Whether the charge be false testimony or suppression of exculpatory evidence, the principles are the same. The defendant is entitled to a fair trial without trickery or overreaching by the prosecution, and the question is whether the prosecutor’s conduct negated that right. The principle is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused (Brady v. Maryland, 373 U. S. 83, 87).
While the principles governing false testimony and suppression are similar, it may be that the tests will differ slightly because intentional false testimony will sometimes be conclusive evidence that defendant was denied a fair trial. For example, in a case like Savvides where the prosecutor knows *174 of a blatant lie by a witness on a material issue, it is clear that defendant’s trial has not had that element of fairness which our justice demands. The resulting prejudice to Savvides could not be characterized or discounted as harmless (Savvides, supra, p. 557). Likewise, there will be cases of suppression equally offensive to our sense of justice for the same reason. As Judge Fkiendly has concluded, “ the strictness of the application of the harmless error standard seems somewhat to vary, and its reciprocal, the required showing of prejudice, to vary inversely, with the degree to which the conduct of the trial has violated basic concepts of fair play.” (Kyle v. United States, 297 F. 2d 507, 514.)
Our approach is in accord with that of the United States Supreme Court. In Napue v. Illinois (360 U. S. 264), where the District Attorney failed to correct his witness’ false testimony that he had received no promise of consideration, the court made its own examination of the facts and the importance of the testimony. The court’s own statement of its holding indicates there is no rule of automatic reversal: “As previously indicated, our own evaluation of the record here compels us to hold that the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial.” (360 U. S., p. 272.)
Similarly, our examination is directed at the prejudice caused to defendant and the effect on the outcome of the trial by the possible concealment of, or misleading testimony regarding, Dagmar Generazio.
It should be noted, on behalf mf the District Attorney, that Dagmar’s story of receiving a phone call from Gloria at Gail Weiner’s apartment was steadfastly denied throughout the pretrial investigation by both Gloria and Gail, and, even if true, fitted with the prosecution’s theory that Gloria may have called Dagmar while she ivas in her apartment and Broudy and Boxer were outside in the station wagon with the trunk. Moreover, defendant knew about Dagmar and her story of a phone call and even cross-examined Geri Boxer with regard to her knowledge of Dagmar. In fact, defendant’s investigator mentioned to Detective Leman in a hallway conversation that defendant knew of the phone call, and he even-asked whether the prosecutor *175 was going to pnt Dagmax on the stand.[2] Thus, the prosecutor had good reason for failing either to see anything of an exculpatory nature in Dagmar’s testimony or to perceive the defense’s inability to locate her.
As a matter of fact, under the difficult circumstances of this entire case, the District Attorney and his staff — in turning over Sandra Ede’s name, offering the evidence of Gloria’s recantations, and correcting various testimony by Gloria just to mention a few instances — have combined a strong sense of fairness with a high degree of expertise.
Concealment or nondisclosure, however, is not ruled out by the good faith of the prosecutor, and, without in any way condoning the failure of the prosecutor to disclose affirmatively Dagmar’s presence prior to the recantation and her story of the phone call, our decision must rest on an examination of the evidence involved, its materiality and prejudicial effect, and most important, its possible effect on the jury. (People v. Kingston, 8 N Y 2d 384, 387; People v. Rosario, 9 N Y 2d 286, 291; Code Crim. Pro., § 542.)
Even if the jury had chosen to believe that Gloria’s recantation resulted from what Dagmar said rather than her anger at Detective Leman, the effect of Dagmar’s testimony would only have been to' challenge Gloria’s credibility. Thi.s the defense attacked so relentlessly at trial that we cannot possibly see how the further challenge as to whether she made a phone call could possibly have affected the jury verdict.
The defense questioned her along her entire road of deviation from the moral norm, while the prosecution made no effort to counter or mitigate this. The prosecutor himself, in summation, referred to Gloria as “ infamous ”, notorious ”, “ the morals of an alley cat ”, “ a moral leper ”, and “ an old whore ”. Yet the jury apparently considered the various corroborating witnesses such as Geri Boxer and David Broudy and the circumstances of defendant’s rental .of the station wagon and his meeting with the deceased, and believed just enough of Gloria’s *176 testimony to convict defendant. We fail to see how Dagmar’s evidence conld have changed this.
The Trial Judge, who had an opportunity to hear and study Dagmax and her testimony, made certain findings regarding her evidence and we cannot improve on his expression of those findings: ‘ ‘ Having seen and heard this witness, I reject her testimony as totally unworthy of belief. While under oath at the hearing, she strained with tireless effort to avoid telling the truth, whether the examination covered her recorded criminal past, the date of her marriage, the frequency which the police telephoned her, or the reaction of Gale Weiner Tracy, a witness called by the prosecution after she submitted a sworn question and answer on behalf of the defendant, upon a certain confrontation. The foregoing are all measurable standards, but of no greater import than the impression.this witness created when set against less tangible marks. I find that she never told the prosecution of receiving a call on any afternoon, I further find that insofar as this witness’ credibility is concerned, her story that she received any call from Mrs. Lazarus [Gloria] on the day, or month, of the killing does not warrant belief.”
Though there are cases holding it to be of no consequence that evidence in question bore upon the prosecution witness’ credibility rather than directly upon defendant’s guilt, here the chain from the evidence to the prosecution witness is quite indirect and must first bridge the gap of Dagmar’s incredibility. Even then it is either cumulative or peripheral. In no case cited by defendant, where the failure to call attention to evidence has required a new trial, has the evidence been so remote from the issue of guilt or so speculative.
The evidence here was not evidence which would have had an effect on the jury’s determination. The prosecutor’s act did not deprive defendant of a fair trial and the People’s conduct of the case was not contrary to fundamental concepts of justice and did not constitute a denial of due process.
Defendant’s remaining arguments were adequately dealt with in the courts below and we find no merit to them. Defendant has had one fair trial and we have found no defect or error requiring a reversal or a grant of a second trial.
The judgment of the Appellate Division should be affirmed.

. For a fuller statement of the facts, see the opinion below (24 A D 2d 32).

. The testimony .indicates that, -when Leman asked if the insvestigator had called Dagmar’s mother in Baltimore, the latter requested the mother’s number but was refused. There was no request for the name, address or phone number of Dagmar nor any indication that the defense could not locate her.