**UNITED STATES of America ex rel. Mark FEIN, Relator,**

**v.**

**John T. DEEGAN, as Warden of Sing Sing Prison, State of New York, Respondent.**

**No. 67 Civ. 2514.**

United States District Court
S. D. New York.

Oct. 13, 1967.

Henry Rothblatt, New York City, and F. Lee Bailey, Boston, Mass., for relator Mark Fein.

Frank S. Hogan, Dist. Atty., New York County, New York City, Eric A. Seiff, Asst. Dist. Atty., of counsel.

PALMIERI, District Judge.

This is a petition for a writ of habeas corpus by a state prisoner who was convicted on November 25, 1964, of murder in the second degree in the death of Rubin Markowitz and sentenced on May 26, 1965, to a prison term of thirty years to life. All remedies at the State level have been exhausted by petitioner. The trial court held a hearing of 16 days duration on a motion for a new trial which resulted in a denial of relief. (See opinion of Culkin, J., Record at pp. 3894–3913).[1] In addition, the appellate courts of the State of New York have closely scrutinized the case. 24 App.Div.2d 32, 263 N.Y.S.2d 629 (1st Dep't 1965), 18 N.Y.2d 162, 272 N.Y.S.2d 753, 219 N.E. 2d 274 (1966). Petitioner's application for a writ of certiorari was denied by the Supreme Court, 386 U.S. 978, 87 S. Ct. 1157, 18 L.Ed.2d 140 (1967).

The petition alleges that the petitioner was denied the due process of law because: (1) the prosecution suppressed

---

1. References to the record are to the record on appeal to the Appellate Division, First Department, and the pagination is that on the bottom of the pages.

evidence favorable to the defense and knowingly used testimony that was false, incomplete, misleading and inaccurate; (2) publicity surrounding his indictment and trial resulted in an unfair trial; (3) evidence procured by an unlawful search and seizure was used against him over objection and without a hearing on its admissibility; (4) the court denied a pretrial motion for examination of the bullets found in the deceased's body and (5) a special (Blue Ribbon) jury under former Section 749aa of the Judiciary Law of New York, McKinney's Consol. Laws, c. 30 was used to try his case.

The body of Rubin Markowitz was found floating in the Harlem River in the early morning of November 8, 1963. Markowitz had last been seen by his family on the morning of October 10, 1963, and by associates at 4:00 p.m. the same day. Markowitz was a part-time grocery clerk whose main activity however, was illegal and covert—that of booking bets. His customers were assigned fictitious names which, along with telephone numbers, were used in the placing of bets. One such name was "Shore", the related telephone number being that of Carmela Lazarus, an admitted prostitute and mistress of the petitioner[2] (hereinafter called Gloria Kendall [Gloria], the alias by which she was known during the period relevant to this case). It was through Gloria that the police learned of the petitioner's existence.

The State's case was essentially this. Gloria testified that the defendant telephoned her on October 10, 1963, at about 5:30 o'clock in the evening, urgently requesting her to come to his "bachelor" apartment at 406 East 63rd Street, New York City. She reluctantly complied and when she arrived he told her he had killed his bookie[3] and exhibited the body in a trunk. At his behest she procured two of her friends, a Mr. Broudy and a Miss Boxer, to help dispose of the

trunk. Petitioner arranged for the rental of a station wagon automobile, but stayed behind as Gloria and her two friends disposed of the trunk by dropping it into the Harlem River. Miss Boxer and Mr. Broudy testified to their part in the disposal of the body.

The various contentions made by petitioner before this Court will now be discussed seriatim.

## SUPPRESSION OF EVIDENCE

Petitioner alleges that the prosecution concealed exculpatory testimony in three instances.

The first concerns Miss Sandra Ede (hereinafter Sandra), a friend of Gloria who spent a good deal of time at her apartment. Gloria testified that Sandra was at her apartment when petitioner called. As she was expecting Miss Boxer at the time she left a message for her with Sandra to go to petitioner's 63rd Street apartment. Miss Boxer testified that when she arrived at Gloria's apartment house she called on the intercom and Sandra gave her the message.

At the post-trial hearing it was established that the district attorney interviewed Sandra and she refused to testify. She stated that if called she would testify that she was not in the apartment at the time and consequently never received the message; that she had never spoken to Miss Boxer on the intercom; and that on the afternoon in question she was in her own apartment to see to the installation of a telephone. The defense was furnished with her name and address but it is claimed that the full extent of her interview was not revealed. It appears from the cross-examination of Miss Boxer, however, that the defense was, in fact, aware of Sandra's potential testimony. (Pp. 780–86).

The second instance concerns information of Mrs. Bennett and her mother,

---

2. Pp. 1113–1118.

3. Petitioner owed the deceased $7,000 as a result of his losing bet on the Los An-

geles Dodgers in the 1963 World Series. (p. 563).

Mrs. McNair, two tenants of the apartment building in which the murder occurred. They occupied an apartment in the rear of the building whereas the petitioner's was in the front. They told the police that they heard shots which they believed emanated from below their windows in the rear of the building. The defense interviewed these women several times prior to the trial but it claims they never revealed this information. It also appears that one of defense counsel dated Mrs. Bennett during this period.

The third concerns Mrs. Dagmar Generasio (herinafter Dagmar), a prostitute associate of Gloria.[4] She told the prosecution that on the day of the murder she had received a telephone call from Gloria during which she asked for assistance in finding a car to move a heavy trunk. Dagmar placed this call at various times from 3:00 to about 7:00 o'clock in the evening. She testified at the post-trial hearing that she received it at 4:00 o'clock in the afternoon. Gloria never testified to making this call. The defense contends that such testimony would have had a damaging effect on Gloria's credibility, perhaps giving rise to an inference that she was involved in the crime before the victim's death as well as after it.

There also was testimony by Dagmar, at the post-trial hearing, to the effect that twice Gloria had asked her to "stick with her" (p. 2588). Finally there was a confrontation between the two women at the district attorney's office during which Gloria yelled at Dagmar and called her a "goddam liar" (p. 3362). The same day—the record does not make clear precisely how long it was after Dagmar left—Gloria recanted her story, only to recant again two days later to return to her original story— the one given at the trial and summarized

above. The prosecutor told defense counsel of both recantations[5] but not of the confrontation with Dagmar.

The defense was aware of the existence of Dagmar, although it knew her by her maiden name Dagmar Finch and did not know she had moved from New York to New Jersey. During the trial one of defense counsel's investigators asked one of the detectives assigned to the case for her address. He replied that he was not at liberty to disclose it. The defense did not pursue the matter further. No request was made of the district attorney nor was any motion addressed to the court. The investigator had told counsel that there was a witness who claimed she had received a call from Gloria to borrow a car (p. 3004), and before the trial was over counsel learned her name was Dagmar Finch. It is apparent that the defense made no effort to pursue the possible use of Dagmar as a witness at the trial.

■ The question posed by the petitioner before this Court is substantially the following: whether the prosecution violated petitioner's right to a fair trial under the due process clause of the Fourteenth Amendment and contravened the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to turn over to the defense an account of the three episodes above discussed.

The instances petitioner cites do not amount to a violation of his rights by the prosecutor. Certainly no misconduct can be found in the handling of the Boxer or the Bennett-McNair information as the defense had access to both. The prosecution's behavior in respect of Dagmar is similarly free from constitutional infirmity. The defense knew of her existence and of her possible usefulness as a witness. Yet no attempt,

---

4. Pp. 345–347.

5. At the close of Gloria's direct testimony the prosecutor called defense counsel to the bench and there made a statement for the record that twice in the course of his investigation Gloria recanted her

testimony about hearing the petitioner admit the shooting and seeing the body in the trunk. The first recantation does not concern us as no question was raised with respect to it in these proceedings.

beyond that of the defense investigator, was made to get her name and address from the prosecution.

■ The doctrine of Brady v. Maryland, supra, does not require the disclosure of such testimony. The Brady rule is that

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. 83, at 87, 83 S.Ct. 1194, at 1196, 10 L.Ed.2d 215.

There is no requirement that the prosecution be the guardian of every possible avenue of investigation available to the defense. Even assuming that a defense request is not always necessary, not every lead or story need be turned over. In Brady, the concealed evidence was an extra-judicial statement by the accused's companion, in which he admitted that he had committed the murder for which they were both being tried. This evidence was clearly material to the sentence as the jury was empowered to restrict the punishment to life in prison.[6] In his summation Brady's counsel's sole request was for just such a limitation.

In Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir. 1964), the suppressed evidence was a ballistics report and fingerprint tests which indicated that the accused's gun, which was marked for identification and waved before the jury although it was not admitted into evidence, was not the weapon used in the offense committed. In Application of Kapatos, 208 F.Supp. 883 (S.D.N.Y.1962), quoted with approval in United States ex rel. Meers v. Wilkins, 326 F.2d 135, 139–140 (2d Cir. 1964), this court found a violation when the prosecution suppressed the testimony of a witness who saw two persons, neither of whom was the accused, escaping from the scene of the crime immediately after he had heard shots. In each of these cases the court found that the concept of due process and fair play had been contravened.

The testimony of Dagmar is not of the same order. Firstly, it relates to the case in only an oblique way, going to Gloria's credibility. Gloria was subjected at the trial to the most exhaustive and punishing cross-examination in which her recantations and her sordid background were thoroughly explored. It does not bear directly upon the guilt or punishment of the petitioner. It does not exculpate the accused as did the evidence in the cases just discussed. Secondly, the district attorney's office felt unsure as to whether Dagmar was telling them the truth (p. 3462). The trial court, in fact, after hearing her testify at the post-trial hearing found her "totally unworthy of belief." (P. 3907). In addition, the police had interviewed a Gail Weiner Tracy. Dagmar said that she received the call from Gloria while at Mrs. Tracy's apartment. Mrs. Tracy denied this when she talked to the prosecution before trial (pp. 1239–41). However, at the post-trial hearing she testified that she did, in fact, remember Dagmar's receiving the call. (P. 1242). The trial court found her unworthy of belief. (Pp. 3912–13).

■ I find nothing improper in the prosecution's actions. Due process of law does not require the prosecutor to held himself accountable to the defense on peripheral matters which he has good cause to believe are untrue, merely because they could conceivably be of some help to the defense. This is particularly applicable in this case where the burdens of the prosecution were heavy, and the myriad aspects of the circumstantial evidence of the crime presented almost infinite possibilities of factual conflicts. Moreover the prosecution would have been justified in rejecting the story as useless since the story Dagmar told until the post-trial hearing was that the call came after 6:00 o'clock. This presented

---

6. Also, under the Maryland State Constitution Art. XV, § 5, the jury in a criminal case are 'the Judges of Law, as well as of fact."

no inconsistency with the prosecution's case.

## PUBLICITY

█ Petitioner alleges that he was denied a fair trial because of publicity surrounding his arrest and trial. The publicity complained of, however, is not of the same order as that in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1965), Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1964), and Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1960). It consisted of several newspaper stories at the time of petitioner's arrest, eight months before his trial, two articles in detective magazines in June, four months before trial, and a column in the New York Herald Tribune during the trial.

There was no sustained level of publicity here as there was in the above-cited cases, the bulk of the publicity complained of having taken place fully eight months before petitioner stood trial. See United States v. Miller, 381 F.2d 529 (2d Cir. 1967). Counsel for petitioner, in effect, conceded this at the hearing on this petition.[7] Defense counsel, who was well aware of the publicity, was able to say during a hearing on June 12, 1964, after petitioner by a habeas corpus petition moved for an immediate trial, "time has passed since then [the time of the bulk of the publicity]. We are willing to go to trial now."[8] Further, petitioner never moved for a change of venue.[9]

Petitioner was accorded a fair trial. Unlike the *Sheppard* case, the trial judge exercised appropriate control of the courtroom and of the jury. He repeatedly admonished the jury to avoid contact with any publicity concerning the case. When defense counsel brought the Herald Tribune column to his attention during the trial he immediately conducted a voir dire examination of the entire jury. This revealed that only one juror had ever seen the article and that he had not read it. No request was made by defense counsel to replace this juror with an alternate. There is no evidence that the jurors who heard this case were prejudiced. This is not a case like *Irvin*, where "continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of" the community. Irvin v. Dowd, *supra*, 366 U.S., at 726, 81 S.Ct., at 1644.

A balance must be kept between the public's right to be informed of public proceedings and the accused's right to a fair trial. Vigilance against the secret trial must be balanced with vigilance against the televised trial. The trial of this petitioner was clearly within constitutional bounds.

## SEARCH AND SEIZURE

Petitioner has alleged that he was denied the due process of law by the trial court's failure to accord him a hearing on the question of the admissibility of what petitioner characterizes as the "fruits of an unlawful search and seizure" and its admission into evidence over defense counsel's objection. The evidence in question is a chair which had been in petitioner's 63rd Street apartment the day of the murder and on which there was a minute trace of blood the source of which was not ascertainable. The police procured the chair, without a search warrant, from a warehouse at which Gloria had stored it, using a pseudonym. She testified that petitioner had told her, "Get rid of all the furniture in the apartment, and get

---

7. Minutes of hearing on this application, pp. 58–59.

8. Petitioner argues that this was due to the fact that he was in jail without bail and had been awaiting trial for three months at that time. Yet when put on bail after this hearing he did not move for a continuance.

9. This is not to say that the failure to request a change in venue is a waiver of one's constitutional claims. The lack of such a request is, rather, an indication that counsel did not view the pressure of publicity as did counsel in *Sheppard, Estes* and *Irvin*.

rid of the rug; get rid of everything." (P. 1169). It seems that Gloria, with Mr. Broudy's help, did, in fact, dispose of the rug. (P. 1170). Petitioner was insistent that she quickly dispose of all the furniture, and when she was proceeding too slowly he said, apparently to prod her, "Just get rid of it. I don't care what you do with it." (P. 1174). In the process Gloria gave a television set to Broudy (p. 1175) and stored the rest of the furniture (pp. 1174–75).

■■ Even assuming the claim was properly preserved, as did the New York Court of Appeals, 18 N.Y.2d 162, 169, 272 N.Y.S.2d 753, 219 N.E.2d 274, petitioner has no standing to assert the violation of any constitutional rights as to this seizure. To have standing "the movant [must] claim either to have owned or possessed the seized property or to have a substantial possessory interest in the premises searched." Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960). "[T]he rule [is] that the fact that evidence has been seized from A in violation of A's rights does not prevent its admission in a prosecution of B." United States v. Granello, 243 F.Supp. 325, 327 (S.D.N.Y.1955) (relating the rule in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 [1963] ),

aff'd 365 F.2d 990 (2d Cir. 1966). See also, United States v. Bozza, 365 F.2d 206, 222–223 (2d Cir. 1966) and Staples v. United States, 320 F.2d 817, 820–821 (5th Cir. 1963). Petitioner's right to privacy under the Fourth and Fourteenth Amendments to the United States Constitution was not invaded. That he had no interest in the stored furniture is made clear by the fact that Gloria threw away the rug and gave the television set to Broudy. It appears abundantly clear that the last thing petitioner wanted was a possessory interest in these articles, or any connection with them. Petitioner cannot now complain of this seizure since Gloria had petitioner's authority to dispose of the chair.

■■ Even were petitioner to have standing, relief would have to be denied. Petitioner had abandoned the property, as much as if he had thrown it into a public wastepaper basket.[10] There is nothing unlawful in the Government's seizure of property in this situation. Abel v. United States, 362 U.S. 217, 240–241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). One cannot throw something away and then claim that constitutional rights have been violated by the police in picking it up. Hester v. United States, 265 U.S. 57, 58, 44 S.Ct. 445, 68 L.Ed. 898 (1924).[11]

10. The question of abandonment is one of federal constitutional law, not of state property law. As the Supreme Court said in Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 733, 4 L.Ed.2d 697 (1960) :

* * * it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical.

11. Work v. United States, 100 U.S.App. D.C. 237, 243 F.2d 660 (1957) and United States v. Merritt, 293 F.2d 742 (3d Cir. 1961) are inapposite. In *Work*, the court, over a vigorous dissent, found that the

movant had not abandoned property for constitutional purposes by tossing it into a trash can beneath *his* porch. In *Merritt*, the court did not find a voluntary abandonment when the illegal search precipitated the throwing of the evidence out the window. Petitioner, in this case, had voluntarily severed his connection with the furniture and it was placed on premises in which he had no interest. Thus, although the evidence was to be used against him, he was not in the class the constitutional prohibition against illegal searches and seizures was meant to protect. See, United States ex rel. Coffey v. Fay, 344 F.2d 625, 628 (2d Cir. 1965), Diaz-Rosendo v. United States, 357 F.2d 124, 132 (9th Cir. 1966), cert. denied, 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966).

## DENIAL OF PRETRIAL MOTION FOR DISCOVERY

■ Petitioner claims he was denied the due process of law by the court's refusal to grant his pretrial motion for examination of the bullets found in the deceased's body. There is no violation of petitioner's rights on this ground. The bullets and ballistics report were in court under the defendant's subpoena and, as the trial court observed, "were his to utilize as he saw fit." (P. 3904). No request was made for a recess to examine the bullets or look at the ballistics report. There is no prejudice to the defendant shown by these facts. Petitioner further contends that he was prejudiced by the "erroneous and misleading" testimony of the police ballistics expert. Petitioner cannot now claim a violation of his rights after his pretrial request was substantially fulfilled at trial and after he had a full opportunity at trial to avoid any prejudice. Petitioner has pointed to nothing that would establish prejudice resulting from the fact that his request was substantially fulfilled at trial rather than before.

## USE OF SPECIAL JURORS

■ Petitioner's final contention is that the use of a special (Blue Ribbon) jury under former Section 749aa of the Judiciary law of New York violated his Sixth Amendment right to an impartial jury and the equal protection and due process clause of the Fourteenth Amendment. The constitutionality of the use of special jurors under this statute has been specifically upheld by the Supreme Court in two cases, Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947) and Moore v. New York, 333 U.S. 565, 68 S.Ct. 705, 92 L.Ed. 881 (1948). Petitioner's contention is without merit. Vanderwyde v. Denno, 113 F.Supp. 918, 920 (S.D.N.Y.1953).

Petitioner's application for a writ of habeas corpus is denied.

Motion denied. It is so ordered.