■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MILTON LANTIGUA, Appellant. [643 NYS2d 963]

In April 1992, a jury found defendant guilty of the murder of Felix Ayala, who was shot to death in front of 1520 Sheridan Avenue, Bronx County, shortly after 1:00 A.M. on the morning of June 27, 1990. An earlier trial, conducted in 1991, ended in a mistrial when the jurors were unable to agree on a verdict.

Apart from the testimony given by Frances Nunez Rosario, who lived in the building in front of which Mr. Ayala was killed, there is no evidence to connect defendant to the victim's death. All the other witnesses to the murder are in general agreement that a tall, thin, long-haired gunman fired at the victim at close range until his gun jammed. He then left the vicinity, returning a few minutes later to again shoot at the decedent as he lay on the ground. Frances Rosario is the only witness to place Milton Lantigua at the scene and the only one to assert that, after the gunman's weapon jammed, defendant fired at the victim. Her testimony commenced on Friday, April 3 and concluded on Monday, April 6, 1992. Still a teenager at the time of the incident, the evidence she gave was confusing, inarticulate, vague, frequently inaudible and extremely hesitant.

Ms. Rosario related that she was returning to her home from the grocery store, located at Sheridan Avenue and 172nd Street, where she had been speaking with a friend. As she walked towards her apartment house, she noticed people gathered in the front of the building. She saw "a light skin tall man—and the deceased. And I also noticed a heavy set light skin individual" (defendant). Asked where the heavy-set individual was standing, she replied, "In front of 1520 when you walking in to your left there was a door there, so there is some steps." (The prosecutor clarified that defendant was to her left as she went into the building.) Ms. Rosario said she did not know the victim, but later learned his nickname was "Felo". She stated that "the tall guy and Felo seem to be arguing."

She then went up the two flights to her apartment, located on the third floor of the building: "To the room at the end of the hall."

The witness appeared extremely reluctant to state if anyone involved in the incident was present in the courtroom. Although asked to describe what happened next some seven times by both the prosecutor and the court, she failed to respond and was ultimately removed from the courtroom. After a recess, the prosecutor managed to elicit that the two men who were arguing "started to walk, and the deceased was shot by the tall individual who he was arguing with." Asked how many shots she heard, the witness replied, "Four." She then said, "I went inside" and "looked out of the window" which is located "right next to the one I was looking out. They both face the front." The witness then stated, "The tall light skin and the heavy set was there." Implored by both the prosecutor and the court to describe what happened (the same question was asked a total of eight times), Ms. Rosario failed to give a meaningful response. The court then adjourned the proceedings for the weekend.

When trial resumed on Monday, April 6, Ms. Rosario testified, "The tall light skin guy put his arm around the deceased." She stated, "I was looking out of the window. You could hear the gunshots, they were fast." In testimony that was largely inaudible and continually interrupted so that her answers could be read back, the witness stated that the victim fell to the ground. Asked what happened next, she said, "I went back to the room. I went back to the room." She proceeded to relate, haltingly, that a heavy-set man, about 5 feet 8 inches tall and 180 pounds, was "next to" the tall light-skinned man whose gun appeared to have jammed, "and the individual that was next to him went and then he shot at the body which was already lying there." Asked to describe any individual she had described who might be in the courtroom by the clothing he was wearing, the witness responded, "Purple slacks." At this point, the prosecutor interjected, "Indicating the defendant, Your Honor."

Defense counsel stated his objection and, at a sidebar conference, requested that the court declare a mistrial. The sufficiency of the identification and the source of the witness's reluctance to answer were discussed. The prosecutor stated, "the witness is very afraid and has been unable to look at the defendant inside of the courtroom as of yet." After hearing the arguments, the court concluded: "She can't see the pants. I can't see them. The identification is very weak. I suggest that

you rehabilitate her because I am not going to declare a mistrial."

Upon resumption of the testimony, the witness was again asked to identify "the person you saw shooting the second time". After this question was posed, in various forms, some seven times without a response, the court again directed counsel to chambers for renewal of the motion for a mistrial. Defense counsel expressed his concerns to the court with respect to the source of the witness's trepidation, suggesting that "there is a good possibility she is being kept in custody and tremendous pressure is being put upon her."

After the court denied the motion for a mistrial, Ms. Rosario finally identified defendant, stating, "He is right there with the black blazer." She said that the second gunshots "weren't as fast as the first" and described the gun used as "smaller". She indicated that she had seen the heavy-set man on prior occasions, "Around the neighborhood." She did not talk to the police on the night of the shooting because she "was scared." When she stated that she next saw defendant "in the crowd downstairs", the prosecutor asked, "Is that why you were scared, Ms. Rosario?", drawing an immediate objection from defense counsel, which the court sustained. Following an off-the-record discussion, the witness recounted how, a month after the incident (July 23, 1990), she identified defendant to police as they drove around the neighborhood in an unmarked police van, at which time defendant was placed under arrest. On cross-examination, she conceded that she had never been threatened by defendant (who was out on bail following the first trial), any member of his family or any of his friends.

Counsel next elicited from Ms. Rosario that she witnessed the shooting from her brother's bedroom window. Later in the course of his cross-examination, the witness was asked if she had a room of her own, to which she responded, "I don't remember. I don't think so." Counsel then inquired who was with her when she witnessed the shooting, noting that she had repeatedly used the term "we" in her testimony before the Grand Jury. The witness responded, "I was probably nervous and I said 'we'. I was by myself."

The witness then testified that, at the time of the shooting, the tall, thin man, the victim and the third, heavy-set man all had their backs turned towards her so that she could not see the heavier man's face. After the shooting, "They ran towards the alley." The taller man returned "in a grayish van" and shot the victim again. The witness stated, "He came out from the back of the van and he shot him and the van took off" with

the gunman inside. She acknowledged that defendant did not return to the scene with the taller man, and affirmed that she saw defendant in the crowd after the arrival of police. Defense counsel concluded his cross-examination by eliciting that Ms. Rosario had been an inpatient at Bronx Lebanon Hospital after she "attempted suicide on two occasions" and that she is farsighted.

A number of other witnesses testified to the events of June 27, 1990, including defendant. While there are significant differences in the accounts—especially whether one or two persons were near the victim when he was first shot—the various witnesses agree that several shots were fired, followed by an interval of from one to five minutes, and then a second series of several more shots. The witnesses are also in complete accord that it was the tall, thin man who first fired at the victim and who returned, in either a van or station wagon, to shoot the victim several more times.

The police officer who responded to the report of shots fired stated that the victim was found lying on his left side towards the south end of the apartment building. The officer remained at the scene to voucher evidence and complete a request for ballistics analysis.

A New York City Medical Examiner testified that Felix Ayala sustained two gunshot wounds to the left side of the head, one to the left forearm and two to the back. One frontal wound to the forehead was a graze wound, but the second bullet entered the left cheek and passed into the victim's brain where it was recovered as copper-jacketed lead fragments. A third bullet passed through the left extremity of the left forearm. The upper wound to the back was caused by a bullet that passed through the heart and the left lung and exited the front of the chest. The lower back wound was the result of a bullet that passed towards the head, from right to left, penetrating the lung. This projectile did not exit the torso, and a deformed, unjacketed bullet (later identified to be from a .38 caliber round) was recovered from the victim's chest cavity. Blunt trauma was observed to the right elbow and knee which, the doctor stated, was consistent with a fall to the ground.

Detectives from the 44th Precinct recovered a deformed lead bullet (.38 caliber) and three 9 millimeter shell casings from the sidewalk near the body. Two fragments of copper jacketing were recovered from the victim's hair. A ballistics expert testified that the two deformed bullets (one recovered by the Medical Examiner's office and the other by detectives) were fired from the same .38 caliber revolver. He also stated that the

three 9 millimeter shells were ejected from the same semi-automatic pistol.

Two defense witnesses disputed Frances Rosario's account of her whereabouts on the night of the murder. Her mother, Maria Pedraza, testified that her son John's bedroom was occupied by her nephew, an overnight guest, and that John was on the sofa in the living room. She merely assumed that her daughter had gone to bed and was in her room, which does not face the street, at the time of the shooting. She also confirmed that her daughter had attempted suicide on two occasions by taking "pills".

Frances's brother, John Rosario, testified that when he heard the shots, he ran from the living room to his bedroom, where his cousin was sleeping, to look out of the window. He saw a slim man, about 140 pounds with long curly hair, standing over the victim holding a "big" gun that appeared to be jammed. He then ran down to the street with the intention of trying to assist the victim when he heard someone yell that a car was coming. He did not see the subsequent shooting because he was running back into the building at the time, but he did hear at least three shots.

On cross-examination, John Rosario agreed, in the prosecutor's words, that "while all of this was going on [he had] no idea where [his] sister was". He conceded that he, too, had received psychiatric treatment. Finally, he provided some basis for his sister's nervousness, explaining that—in the neighborhood generally and particularly within his family—cooperation with the police was not condoned.

On summation, the prosecutor took the position that the defense witnesses were defendant's friends and, therefore, not worthy of belief. She argued that Frances Rosario "was the only witness that had testimony consistent with the ballistics evidence in this case." She emphasized that, based upon a photograph that Frances had marked to indicate the window from which she alleged to have witnessed the murder, "it would be very clear to you how she could see what she said she saw."

The prosecutor further stated that "this is a case not only about murder but about intimidation." She characterized Frances Rosario as fearful: "She didn't tell you she was directly threatened but she told you she was indirectly threatened. Ladies and gentlemen she came in here, you saw her, was she afraid or was she lying?" The prosecutor also suggested that her mother "fears for the safety of her daughter and for her family."

In commenting on the substance of the evidence given by

Frances Rosario, the prosecutor stated that, after the first shots were fired by the unapprehended gunman: "The next thing she tells you is the gun appears to jam or something and the guy is kind of playing with it. At this point Milton Lantigua takes out his own gun—she says a smaller gun, he takes out the gun while the body is laying on the floor and he pumps another three shots into the body."

Viewed in the entirety, the prosecutor's summation cannot be remotely regarded as fair comment on the testimony. First, apart from the four shots initially fired by the unapprehended gunman, Ms. Rosario did not state that any particular number of shots were fired. She merely stated that the second series of gunshots, those she alleged to have been fired by defendant, "weren't as fast as the first."

Second, Ms. Rosario's testimony is not consistent with the ballistics evidence. She stated that the unapprehended gunman had his arm around the victim and that they were walking away from her when she heard four shots fired; that the victim fell to the ground; that the assailant's gun jammed; that defendant then fired an unspecified number of bullets into the body; and that the original gunman later returned and fired even more bullets into the victim. The question naturally arises why the deceased did not sustain more gunshot wounds. Testimony from both the ballistics expert and the City Medical Examiner confirms that at least five rounds were discharged, resulting in the three frontal and two back wounds sustained by Felix Ayala. There is no evidence that the victim was initially shot in the back. Furthermore, it seems highly unlikely that the injuries caused by the bullet which struck the left side of his forehead, producing a graze wound, and by the bullet that entered his left cheek, fragmenting in the brain, could have been received while the victim lay on the ground on his left side. It is far more likely that the injuries caused by the two .38 caliber bullets fired into the right side of the victim's back were sustained as he lay on his left side.

The evidence therefore suggests that Mr. Ayala was initially shot, from the front, and killed with a 9 millimeter semi-automatic pistol loaded with copper-jacketed ammunition and fell to the ground, coming to rest on his left side. Two more bullets were then fired into his back from a .38 caliber revolver, the one with the lower point of entry passing from right to left (that is, towards the ground). This scenario is consistent with the account of events given by other witnesses, but not with that given by Ms. Rosario, who is the only witness to allege that there were three groups of shots.

While the physical evidence might be open to interpretation, the prosecutor's numerous remarks that this was a case of "intimidation", involving a witness who was "afraid", are clearly contradicted by the evidence. At no time did Ms. Rosario allege having been threatened by defendant, his family or his friends—even indirectly as the prosecutor claimed. The People do not deny that defendant was free on bail, living in the same neighborhood as Ms. Rosario, within a block of her apartment house. Yet the record contains no indication that any complaint was ever made that either the witness or her family were subjected to any harassment or intimidation.

Defendant's conviction rests entirely on the eyewitness testimony of Frances Rosario. Taken together with her unexplained reluctance to identify defendant at trial, the jurors were invited to draw the conclusion that she had reason to be afraid of him. In a case which pitted the credibility of the People's sole eyewitness against the numerous witnesses presented by the defense, the comments of the prosecutor served to inflame the passions of the jurors (*People v Ashwal*, 39 NY2d 105, 109-110). The resulting prejudice cannot be said to have been harmless and, in the interest of justice, a new trial is warranted on this basis (CPL 470.15 [1]; *People v Robinson*, 36 NY2d 224, 228-229, *mot to amend remittitur granted* 37 NY2d 784).

However, the distortion of the evidence during the summation is not the main issue on appeal. This matter is before the Court because, before defendant was sentenced, Frances Rosario recanted her identification testimony. Defendant moved to set aside the verdict against him on the ground of newly discovered evidence (CPL 330.30) and a hearing was conducted, following which Supreme Court decided that Ms. Rosario's recantation is not credible and that no new trial is required. We disagree.

The issue here is not the credibility of the witness's recantation, it is the credibility of the witness's testimony at trial. It was revealed, during the course of the hearing on defendant's motion, that not only was she not alone at the time she claims to have witnessed the murder of Felix Ayala, but that the prosecutor was aware that she was not alone. During her testimony at the hearing, the prosecutor conceded that she was told by Ms. Rosario that she had used the word "we" during her Grand Jury testimony because she was with a man (whom she now identifies as "Jo-Jo") who did not want to be involved with the trial and who, in any event, had allegedly returned to the Dominican Republic. Supreme Court nevertheless found

that, because any evidence which might be offered by this potential witness has not been shown to be exculpatory, the presence of another person in the company of the witness at the time of the shooting is purely collateral to the question of defendant's guilt or innocence. Therefore, the court concluded that the People did not violate their obligations to the defense under *Brady v Maryland* (373 US 83) and denied the motion to set aside the verdict.

As the Court of Appeals stated in *People v Baxley* (84 NY2d 208, 213), "A prosecutor's duty of disclosing exculpatory material extends to disclosure of evidence impeaching the credibility of a prosecution witness whose testimony may be determinative of guilt or innocence (*People v Fein*, 18 NY2d 162, *cert denied* 385 US 649; *see, Giglio v United States*, 405 US 150, 154; *see, People v Steadman*, 82 NY2d 1, 7)." The Court further emphasized *(supra,* at 213-214), "The 'good faith' of a prosecutor is not a valid excuse for nondisclosure (*Giglio v United States, supra*)." In such circumstances, it is appropriate to hold a hearing (CPL 440.30 [5]) to "determine in the first instance whether, in the context of the entire trial, the omitted evidence creates a reasonable doubt that did not otherwise exist (*see, United States v Agurs*, 427 US 97, 112-113; *People v Chin*, 67 NY2d 22, 33; *People v Smith*, 63 NY2d 41, 67, *supra*; *see also, United States v Bagley*, 473 US 667, 682; *cf., People v Vilardi*, 76 NY2d 67). If so, the judgment of conviction must be vacated and a new trial ordered." *(Supra,* at 214.)

In the context of a trial in which the credibility of the sole witness connecting the defendant to the crime is paramount, the failure to disclose that the version of events given by that witness may be at variance with the truth is a clear violation of the *Brady* obligation. While the prosecutor contended that the witness's "identification of Mr. Lantigua was never an issue for us", the sincerity of her belief in defendant's complicity in the murder does not excuse the failure to disclose facts that might have seriously eroded the credibility of the testimony given by the People's eyewitness. It was conceded by the prosecutor that Ms. Rosario "indicated to me that she was with a guy, I guess the guy she snuck out to meet."

Viewing this evidence in the context of the trial, it is immediately apparent that, if Ms. Rosario had "snuck out" to meet "a guy", even now identified only as "Jo-Jo", it would go far towards explaining why her brother did not see her at his bedroom window, from which Ms. Rosario claimed to have witnessed the murder. Apart from any consideration of the relative credibility of the conflicting testimony given by Frances

Rosario and her brother, John, there is also the question of exactly where Ms. Rosario was at the time the murder was committed. The prosecutor went to great lengths to convince the jurors that Ms. Rosario, from her vantage point at the bedroom window, must have seen what she claimed to have seen. But, in light of the divulgence that the witness must have been elsewhere, her trial testimony reveals flaws that are not otherwise apparent. Rather than the continuous, unobstructed view, it is now evident that she was moving from place to place while the shooting was in progress. She testified, on one occasion that, after hearing the first gunshots, "I went inside" and on another occasion (after trial had been recessed for the weekend), "I went back to the room. I went back to the room." Defense counsel would doubtless have been interested to extract where, exactly, the witness was before she "went inside" or "back to the room" and what transpired that she was unable to see in the interim.

The People's failure to disclose the existence of another witness to the events of the early morning hours of June 27, 1990 deprived the defense of the opportunity to investigate what that witness might have observed. More importantly, it deprived the defense of the ability to conduct a knowledgeable cross-examination of the People's eyewitness on such matters as her whereabouts, her view of the unfolding events, any distractions caused by the presence of another person, and her general credibility.

The failure to disclose that the eyewitness was not alone is especially egregious in view of defense counsel's direct questions to Ms. Rosario on this point. Counsel inquired, generally, about the presence of someone else at the time she claimed to have witnessed the murder and, specifically, about her use of the term "we" during her testimony before the Grand Jury. When the witness responded that "I was probably nervous and I said 'we'. I was by myself", the prosecutor permitted the statement to remain on the record without informing the court that it was perjured. As the Court of Appeals noted in *People v Pelchat* (62 NY2d 97, 105), the prosecutor "is charged with the duty not only to seek convictions but also to see that justice is done." It hardly advances the interest of justice for a prosecutor to use testimony she knows to be false to discredit the evidence given by defense witnesses during her summation. We are unable to agree with Supreme Court that Frances Rosario's recantation is either incredible or collateral to defendant's guilt or innocence and, in view of the weakness of the People's case and the prejudicial effect of the prosecutor's remarks on

summation, we therefore remit this matter to Supreme Court for a new trial. Concur—Milonas, J. P., Rosenberger, Ellerin, Rubin and Williams, JJ.