*25 OPINION OF THE COURT
Alan L. Honorof, J.
Defendant’s motion to dismiss said accusatory instrument is determined as hereinafter provided.
At the outset, the chronology of certain pertinent events is uncontested. On February 21, 1997, Sammy Jones died of injuries he sustained in a confrontation on February 10, 1997, during which one of the other people involved allegedly struck him in the head with a baseball bat. The Medical Examiner determined that the victim died of blunt force head trauma, which could have been caused by a bat.
On February 27, 1997, Ragan Martin was arrested by the Freeport Police for criminal sale of a controlled substance in the third degree, and stated that he had information regarding Jones’ death. When interviewed on that same date by veteran Nassau County Homicide Detective Robert Dempsey, who took notes thereof, Martin said, in relevant part, that at the time and place in question, he saw three males surround Jones. He described two of those individuals as wearing dark clothing; one of them had dredlocks and no hat or cap. Martin stated that the third male was wearing a beige/tan three-quarter length leather coat and a knitted ski-type cap with a short brim.
Martin told Detective Dempsey that he recognized that third person as one he knew by the names of “Sha” and “Corey”. He said that he had known Sha for approximately six to eight months; he had purchased crack more than 12 times from Sha, who lived in a big, white house on Leonard Avenue in Free-port. Martin told the detective that he saw the three males jump on Jones. He also stated that he saw Sha swinging a bat at Jones’ head and the other two “stomping” Jones when he fell down.
Martin specifically told Detective Dempsey that he saw Sha strike Jones in the head with the bat at least five or six times. He further stated that after he saw the three run across the street and lost sight of them, he heard car doors slam and a car start up with a loud muffler or motor. He heard the tires screech, but the car did not come towards him.
Among the other things he told Detective Dempsey on February 27, 1997, Martin said that he subsequently saw Sha driving his medium blue Camaro, and that the other two “guys” were still with him, in the car, as it sped passed him, even though he had yelled “Yo!” to them. Martin also stated that when he went to Sha’s house to “cop some crack” about three days before meeting with Detective Dempsey, he asked Sha why he hadn’t stopped for him that night, and Sha told him, “I *26 had just done something, and it was some fucked up shit, and I had to get out of there!” Finally, Martin added that approximately two years earlier, Sha told him, “If a nigger gives me a hard time, 111 bat the nigger out.”
Later on February 27, 1997, into the morning of February 28, 1997, a polygraph exam was administered by the Nassau Police to Martin “in order to validate his assertion” of what he had witnessed. The resulting opinion was that Martin was apparently telling the truth; no significant deception was noted. Only one response was questionable, and was seemingly clarified when the victim was referred to by the examiner as “Sammy”, instead of his street name, “Justice”.
Thereafter, on February 28, 1997, Martin’s account of what he had observed was reduced to a signed, written statement. In that statement, which was witnessed by Detective Dempsey and another detective, Martin reiterated that it was “Sha”, who he also knew as “Corey” and “Shamel”, who had repeatedly hit Jones in the head with a bat and who, days later, said that he hadn’t stopped for Martin that night because he “did some fucked up shit and * * * had to get out of there.”
Also on February 28, 1997, Detective Dempsey showed Ragan Martin six photographs, including one of the defendant, Shonnard Lee. Martin positively identified the photograph of Corey Jones as “Sha”, also known as “Shamel” or “Corey’, and signed a statement attesting to that identification. In addition, Martin did a “drive-by” identification of Jones’ home and blue Camaro.
On April 11, 1997, Ragan Martin participated in a videotaped interview with an Assistant District Attorney. Again, in sum and substance, Martin identified Corey Jones as the person who had attacked “Sammy’ with a bat, although the prosecutor proceeded to raise questions regarding the witness’s credibility.
At this point, it should be noted that throughout the investigation, which commenced upon the discovery of Sammy, Detective Dempsey interviewed numerous witnesses, some of whom implicated and/or provided a motive for the defendant, Shonnard Lee, his brother, Silas Lee, and others in Jones’ death.
On June 13, 1997, Detective Dempsey arrested Tejuan Crum for Jones’ death, on the basis of information supplied by Jermell Lawson, that Crum had told Lawson that the defendant, Shonnard Lee, had hit the victim with a stick and Crum had *27 kicked him when he fell down. Crum, however, furnished an alibi, which was verified. He also incriminated the defendant, Shonnard Lee, who had told him that he was “going to fuck Sammy up” for burglarizing his home and trying to sell his VCR, and had subsequently admitted to Crum that he had beaten Jones with his baseball bat.
On June 17, 1997, Detective Dempsey arrested the defendant, Shonnard Lee, from whom he obtained full oral and written confessions. The case was presented to the Grand Jury on August 28, 1997. As of that date, the defense had not been informed in any way whatsoever about Ragan Martin and/or the information which he had given to the police and the prosecutor. Nor was there any mention of, or testimony by, Martin before the grand jurors. The defendant, who had declined to testify or to call any witnesses before the Grand Jury, was indicted for one count each of murder in the second degree and manslaughter in the first degree.
On January 9, 1998, almost seven months after the defendant’s arrest, and five months after his indictment, the defense first learned of Ragan Martin, when Detective Dempsey’s handwritten notes of their interview were disclosed by the prosecution as Rosario material for the suppression hearing which was about to commence. The People did not turn over a copy of Martin’s videotaped interview until May 1998. At the end of that month, defense counsel was informed that Ragan Martin was in the Nassau County Correctional Center and immediately interviewed him. Thereafter, the People further disclosed Martin’s polygraph exam, additional statements and the photo array, from which he had identified Corey Jones as the assailant who had repeatedly hit Sammy in the head with the bat.
Certainly, here, as in People v Robinson (133 AD2d 859, 860): “Even if the prosecution had valid reasons to consider this witness to be unreliable, it should nonetheless have provided the defense with this important exculpatory information which was clearly Brady material (see, People v Fein, 18 NY2d 162, 172, appeal dismissed and cert denied 385 US 649).” Indeed, the People do not dispute their breach in this regard.
Nonetheless, “ ‘constitutional error occurs only if the evidence which was not disclosed was material in the sense that “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different” ’ (People v Chin, 67 NY2d 22, 33, quoting from United States v Bagley, supra, at 682; see also, People v *28 Robinson, 133 AD2d 859; People v Alongi, 131 AD2d 767)” (People v Vilardi, 150 AD2d 819, affd 76 NY2d 67).
Thus, it is settled law that: “The rule of Brady v Maryland (supra), does not direct disclosure at any particular stage of the proceedings (United States v Kaplan, 554 F2d 577). The issue is whether the evidence was disclosed in time for the defense to use it effectively (see, People v Simmons, 36 NY2d 126; People v Mackey, 52 AD2d 662).” (People v Jemmott, 144 AD2d 694, 696; see, People v Perkins, 227 AD2d 572, 574; People v White, 178 AD2d 674, 675; People v Bolling, 157 AD2d 733.) In the particular circumstances presented here, the answer to that question is a resounding no.
Of course, the courts have held that a defendant is not deprived of a fair trial where the exculpatory evidence is disclosed in sufficient time for meaningful opportunity to utilize it thereat. (See, e.g., People v Cortijo, 70 NY2d 868, 870.) And, it has long been recognized that “[a] Grand Jury proceeding is not a ‘mini trial’ (People v Brewster, 63 NY2d 419, 422, supra), but a proceeding convened primarily ‘ “to investigate crimes and determine whether sufficient evidence exists to accuse a citizen of a crime and subject him or her to a criminal prosecution” ’ (People v Valles, 62 NY2d 36, 38, supra)” (People v Lancaster, 69 NY2d 20, 30, cert denied 480 US 922).
Nevertheless, the People are not without bounds in the Grand Jury, and must avoid unfounded and/or needless prosecutions. (People v Lancaster, supra, at 27-28.) Nor may the prosecutor withhold evidence which would materially influence the grand jurors. (People v Holmes, 118 AD2d 869, 871.)
Thus, subject thereto, it has been uniformly held that “ ‘the People maintain broad discretion in presenting their case to the Grand Jury and need not seek [out] evidence favorable to the defendant or present all of their evidence tending to exculpate the accused’ (People v Mitchell, 82 NY2d 509, 515; People v Lancaster, 69 NY2d 20, 26, cert denied 480 US 922; People v Kaba, 177 AD2d 506, 508)” (People v Ramjit, 203 AD2d 488, 489).
For, Grand Jury proceedings are nonadversarial, except for the provisions of CPL 190.50 (5) and (6), which set forth the defendant’s right to testify and/or request that body to hear certain witnesses. (See, People v Martucci, 153 AD2d 866, 867.)
Moreover, “[i]n the ordinary case, it is the defendant who, through the exercise of his own right to testify and have others called to testify on his behalf before the Grand Jury (CPL *29 190.50 [5], [6]), brings exculpatory evidence to the attention of the Grand Jury” (People v Lancaster, supra, 69 NY2d, at 26; see, People v Ramjit, supra, 203 AD2d, at 489-490). However, this was not possible in the present case, due directly to the Brady violation.
As succinctly stated by one court, <£[w]hether and how severely the People should be sanctioned for the Brady violation turns on the importance of the evidence lost and to what extent a defendant has been prejudiced by that loss * * * In addressing such violations, ‘the overriding concern must be to eliminate any prejudice to the defendant while protecting the interests of society'. (People v Kelly, 62 NY2d 516, 520 [1984].)” (People v Jackson, 168 Misc 2d 182, 188.)
Contrary to the People’s contention, the failure at bar is by no means limited to a mere credibility issue properly reserved for trial. (Compare, People v Scruggs, 201 AD2d 514, 515; People v Martucci, supra, 153 AD2d, at 867; People v Sepulveda, 122 AD2d 175, 177.) Rather, by reason of the complete lack of disclosure of the subject exculpatory evidence, about which the Grand Jury heard absolutely nothing, defendant’s right to testify and, perhaps more importantly, his right to request that the Grand Jury call Ragan Martin as a witness, were violated. (CPL 190.50 [5], [6].)
Accordingly, fairness dictates, and the law requires, that the above-captioned indictment be and is hereby dismissed, as the product of a defective Grand Jury proceeding, the integrity of which, on this record, was impaired, and prejudice to defendant may have resulted. (CPL 210.20 [1] [c]; 210.35 [4], [5].)
The People are granted leave to re-present this case to the same or another Grand Jury, pending which defendant’s bail status is continued. (CPL 210.20 [4]; 210.45 [4], [9].)