THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MARK FEIN, Appellant.

First Department, October 19, 1965.

*Louis Nizer* of counsel (*Robert Arum, Paul Martinson, Harold Klapper* and *George Berger* with him on the brief; *Phillips, Nizer, Benjamin, Krim & Ballon,* attorneys), for appellant.

*Eric A. Seiff* of counsel (*H. Richard Uviller* with him on the brief; *Frank S. Hogan, District Attorney*), for respondent.

STEUER, J. In the early morning of November 8, 1963, Fred Petraca, a stationary engineer who operated the Spuyten Duyvil Drawbridge of the New York Central Railroad noticed a body floating in the Harlem River. The body was later identified as the remains of Rubin Markowitz, a part-time grocery clerk whose main occupation had been the booking of bets on sporting events. Investigation revealed that the deceased was last seen by his family on the morning of October 10, 1963, and the last-known contact with him was a telephone call to one of his customers at 4 o'clock that afternoon.

Further investigation developed that the deceased did a large part of his book-making business by telephone. For this purpose he employed an answering service. The procedure

was for the customer to call the service and leave a telephone number at which he could be contacted. Markowitz called the service at half-hour intervals, received the numbers and made the calls. In these arrangements the customers were given fictitious names. One of these names was "Shore" and the telephone number was that of an apartment at 125 East 73rd Street. The tenant of this apartment was a Mrs. Carmela Lazarus. She was a woman with an extraordinary number of aliases, who at the time was known as Gloria Kendal. It was through her that the prosecution learned of the defendant. And it was through her and by virtue of the information given by her that the defendant was charged with homicide and convicted by a verdict of the jury of murder in the second degree.[1]

The defendant challenges the validity of the verdict and judgment of conviction, advancing some 17 specifications of error. We have examined all of these but find that only 6 merit discussion. These 6 can be conveniently treated under 3 headings — whether the evidence was sufficient to convict beyond a reasonable doubt; whether the District Attorney suppressed exculpatory evidence; and whether the prosecution countenanced false testimony, knowing it to be false, and failed to correct it.

In bare outline, the case of the People was that the defendant, on October 10, at about 5 o'clock in the evening telephoned Gloria Kendal and urgently requested her to come at once to an apartment located at 406 East 63rd Street. Upon her compliance he told her he had killed Markowitz and exhibited his body, which was resting in a trunk. At defendant's suggestion she procured the services of two friends, and the three of them took the trunk in a station wagon to the end of Dyckman Street at the Harlem River and dropped the trunk into the river.

There is no contradiction of the testimony giving this sequence of events, but defendant challenges it on the grounds of inherent improbability, variance with physical and known facts, and the unreliable character of the testimony used to establish it.

The first argument rests on the character of the defendant. It appears that he is a businessman, married and the father of three children. He and his family lived in very comfortable

---

1. Following conviction a motion was made for a new trial on newly discovered evidence. The motion was denied. The notice of appeal embraces that determination, but no error in that decision was urged on appeal. Nevertheless, we have given attention to the testimony elicited, where appropriate to the points raised.

circumstances, and he was possessed of substantial resources. He had no prior criminal record and no history of violence was established. It is claimed that it is highly improbable that one so circumstanced would engage in a homicide where the only suggested motive was to escape payment of a debt of some $7,000.

The reverse of this picture must also be considered. Defendant had long been addicted to betting substantial sums with book-makers. He also indulged in extensive association with prostitutes. It clearly appears that he not only contributed largely to the support of the Kendal woman, he also maintained the 63rd Street apartment for extramarital activities. While these activities might have been well within the limits of defendant's financial competence, there was evidence that on occasion he did borrow to meet his expenses for this double life. Money difficulties were therefore not entirely to be ruled out. Nor did the prosecution's case rest on the motive of robbery. This was merely advanced as a possible explanation. The jury might well have found that the defendant, having chosen to inhabit the half-world that he did, would be subject to the stresses, and the methods of relieving them, that are more common to its denizens than to those whose activities conform more strictly to conventional standards.

The defendant advances several grounds for claiming that the physical facts belie the narration of events by the prosecution witnesses. We will consider these separately. The testimony was that, after the trunk containing Markowitz' body was loaded on the station wagon, the vehicle was driven to the 73rd Street apartment, where Miss Kendal got out and went to her apartment. The station wagon remained parked in the street. The two persons remaining with it estimate the time that they waited for her as between 30 and 45 minutes. She places it at far less — about 10 minutes. The seriousness of this incident lies in the claim that a bleeding body would be liable to attract attention and that Miss Kendal's assistants would never have taken such a risk. To counteract this, there is no proof that the body was bleeding at the time, and some hours after death it does not appear that it would be. Furthermore, the testimony was that defendant stated that he had placed canvas bags in the trunk to absorb any blood and prevent leakage. Lastly, it was for the jury to say whether people who would undertake an enterprise of this nature would be so worried about such a contingency that they would not possibly have waited for this period of time.

Next it is claimed that it was a physical impossibility for these three to have lifted the trunk out of the station wagon and to have dropped it over the wall which borders Dyckman Street. Markowitz in life weighed about 185 pounds. There is no proof of the weight of the trunk, but for the purposes of this argument we will assume that the claim that it weighed 50 pounds is sufficiently accurate, thus making the total weight about 235 pounds. The wall in question is about four feet high. The proof of the lifting and carrying is not particularly detailed. The three people involved were: Miss Kendal, five feet seven inches tall and weighing about 135 pounds. She describes herself as a particularly strong woman. Broudy, the only man taking part, was an inch taller, and weighed 165 pounds. He had been a taxi driver for most of his adult life. Miss Boxer's dimensions do not appear, and the record is not consistent as to how much assistance she lent the other two. In view of the very short distance the trunk would have to be carried (about 7 or 8 feet) and the fact that in the lifting a portion of the weight could be made to be borne by the wall itself by canting the trunk, plus the fact that the jury had ample opportunity to judge the strength of these persons, we believe that it cannot be said that this testimony represented a physical impossibility.

The defendant also contends that if the trunk were dumped into the river at 179th Street on October 10, the body could not have been found on November 8 at Spuyten Duyvil, some three miles away. Admittedly, the record is barren of any scientific proof as to whether or not these facts are physically inconsistent. The point was never raised until after the trial.[2] From the testimony in the case, it did happen, and there is nothing to show in this highly controversial area that it could not have happened.

Finally on this phase of the argument the defendant points to the absence of any evidence of blood on the furniture or walls of the 63rd Street apartment. From the medical testimony it is fairly conclusive that the deceased must have shed a considerable quantity of blood. None of the three witnesses who were in the apartment on the evening of October 10 saw any blood on the furniture, and an examination of the furniture disclosed only one minute speck on a chair. This speck was so small that it could not be typed. As proof that the

2. Testimony to this effect was offered on the motion for a new trial. We do not find it to be of such conclusive nature that the interests of justice would require a new trial; and on the question of whether the jury verdict was proper, it cannot, of course, be considered.

homicide took place in the apartment, it can be disregarded. However, there was evidence that a section of the carpet had been cut away prior to the arrival of the witnesses at the apartment and the resulting strips of material were in a duffle bag. This bag was taken in the station wagon along with the trunk, and similarly disposed of.

We conclude that these facts do not demonstrate that the homicide could not have occurred in the apartment, nor that the narration of facts by the People's witnesses is factually impossible. It is true they raise issues but in no sense do they preclude a finding that no reasonable doubt existed.

We come now to the question of the reliability of the testimony. It is not disputed that Mrs. Lazarus or, as she was generally referred to on the trial, Gloria Kendal, was a completely amoral person who could well merit the defense's description as a depraved character. It has, however, often been recognized that crimes in the category here under review are seldom committed in the presence of reliable and substantial witnesses. Either such crimes must go unpunished or the jury must be allowed to make a determination that on this occasion the testimony reflects what actually happened (see *People* v. *Peller,* 291 N. Y. 438, 446). Such a determination most frequently is largely influenced by the relationship of the testimony from the doubtful source to facts established from more certain origins. Applying that test it will be found that the record reveals as follows:

The defendant on October 10 owed the deceased $7,000. A friend of his, one William Tishman, owed the deceased about $14,000. Defendant arranged with Tishman to pay off both debts on October 10, the money being supplied mostly from the proceeds of a loan on collateral supplied by the defendant. Tishman was to give the defendant his share but was unable to do so, and gave a note. Defendant, in a statement to the police, claimed that he had paid the entire debt to the deceased on the afternoon of October 10. Miss Kendal saw the Tishman note in defendant's possession when she was at the apartment in the early evening of October 10. So that some contact between the deceased and the defendant on the day in question was abundantly established.

Miss Kendal's testimony was that on her arrival at the 63rd Street apartment the immediate question considered was the disposal of the trunk containing the body. For this purpose she enlisted the aid of David Broudy, a friend of hers, who came to the apartment in response to her call. Broudy came in his brother's automobile but, when he saw the trunk,

he told the defendant that he could not get it into his car. The defendant thereupon arranged for the rental of the station wagon. The latter fact is established by the records of the rental company and the unimpeached testimony of its officer and of the employee who turned over the station wagon to the defendant. Miss Kendal testified that she went with the defendant to the rental agency and the rental agent of the 63rd Street apartment building testified that he saw them leave the apartment together at the time she indicated. Furthermore, it appears without doubt that the defendant tried to conceal the fact that he had rented the station wagon by disputing the car rental charge and laying a trap to confuse the employee who turned over the station wagon to him. So the defendant's connection with the disposal of the body as testified to by Miss Kendal was amply established.

It also appeared that defendant misinformed the police in the early stages of the inquiry as to his connection with the apartment on 63rd Street and his relationship with both the deceased and Miss Kendal. The apartment was rented in the name of William Weissman, though the defendant paid the rent in cash, bought the furniture, and later terminated the lease, paying the rental until the apartment was rerented. The only record connection was that his name appeared as a reference for the fictitious Weissman in the application for a telephone. When questioned by the police as to this, he stated that the apartment was rented by a prostitute named Margaret Foster, and that he gave the reference as a favor to his friend Tishman, who was the protector of Margaret Foster, and also the '' Shore '' who appeared in the deceased's books. Actually, Margaret Foster was one of the many aliases of Carmelia Lazarus or Gloria Kendal.

Many other items of testimony confirm parts of the testimony given by Miss Kendal, in addition to that given by Broudy and the third member of the disposal group. It leads to the conclusion that on this very material part, the prosecution's contentions were established beyond a reasonable doubt. The only fact which rests on her unsupported testimony is that the defendant did the actual shooting.[3] Considering all the facts which corroborate her testimony in the related aspects of the case, we would not say that the prosecution rests on testimony so questionable that it can-

---

3. The defense contends that the fact that Markowitz' body was in the trunk also rests on her unsupported testimony. While no one else testifies to seeing the body, Broudy testified to an admission by the defendant to that effect.

not remove any reasonable doubt. Beyond that we have no function. It is for jurors not Judges of an appellate court to decide the issue of guilt (*People* v. *Mleczko*, 298 N. Y. 153, 163).

Passing now to the claims of concealment of exculpatory testimony by the District Attorney, we find that four such instances are claimed.

The first of these concerns Sandra Ede. Miss Ede was a prostitute who spent a good deal of time in the Kendal apartment on 73rd Street. Miss Kendal testified that she was in the apartment on October 10 when the defendant called. Miss Kendal had an appointment with a Miss Geraldine Boxer who was to call for her in Miss Boxer's car. Kendal testified that she told Ede she was going to 63rd Street and to tell Miss Boxer when she arrived that she had gone there and that Miss Boxer should meet her there. Miss Boxer testified that when she arrived at the Kendal apartment house she called on the intercom and the Ede woman gave her the message.

On the motion for a new trial it was established that the District Attorney interviewed Miss Ede and she refused to testify. She stated that if called she would testify that she was not in the apartment at the time and consequently never received the message; that she had never spoken to Miss Boxer on the intercom; and that on the afternoon in question she was in her own apartment to see to the installation of a telephone. Concededly the District Attorney gave the defense the name and address of Miss Ede but the claim is that the full extent of her interview was not revealed.

However, it appears that whether or not it was revealed by the District Attorney or obtained through interviewing Miss Ede, the defense was well aware of Miss Ede's contentions. It appears that Geraldine Boxer, whose testimony Miss Ede contradicted, was brought to the office to confront Miss Ede. On the cross-examination of Boxer, the following occurred:

"Q. Did Sandra deny that? A. She said she doesn't remember.

"Q. Did Sandra say that she didn't talk to you on the telephone that day? A. I don't know. As far as I know, when I was there she said she didn't remember; she couldn't remember that date in particular.

"Q. Wasn't some way of fixing the date discussed in the District Attorney's office? A. I don't know what you mean by fixing the date.

"Q. Well was there something said about the installation of a telephone? A. Yes.

"Q. And didn't Sandra fix the date by the installation of a telephone, and did she not say that she did not speak to you that afternoon, because her telephone was being installed in some other place? Did she say that? A. I believe she said her telephone was being installed, but I also believe that the time element was not asserted."

It therefore appears that all the Ede statements were known to the defense. Despite this knowledge the defense did not call her as a witness. The contention of concealment was not proved.[4]

The second alleged failure to disclose concerns the information of Mrs. Bennett and her mother, Mrs. McNair. These ladies were tenants of an apartment in 406 East 63rd Street. They occupied an apartment in the rear of the building, whereas the "Weissman" apartment was in the front. They were interviewed by the police and told them that on the afternoon of October 10 they heard pistol shots which they believed emanated from the alleyway beneath their windows and in the rear of the house. Concededly the defense also interviewed these ladies before the trial but it is claimed they never revealed this information. As there were several interviews it is difficult to see what else could have been discussed, as these women did not profess to have any other relevant information.

The third alleged failure is in regard to Mrs. Generazio, an associate of Miss Kendal in the practice of prostitution. She also used many names. In an interview with the District Attorney she told the prosecution that at 3 o'clock in the afternoon of October 10 the Kendal woman had telephoned her asking her to procure an automobile to transport a large box. Her story varied from time to time from negation of the call to placing it at 9 o'clock that evening, but at the time of the hearing it had crystallized to the early afternoon, preceding a certain television program which she watched. The District Attorney never gave the results of these interviews to the defense, nor did he volunteer the name and address of the witness. That the defense was aware of her existence is undeniable — counsel asked about her on cross-examination, using one of her aliases. A Mr. Whelan, an ex-police officer who was hired as an investigator by the defense, asked one of the detectives for her address. The detective replied that he was not at liberty to disclose it. The defense did not pursue the matter further, and no request was made by counsel or anyone else to the District Attorney.

---

4. It is also significant that despite the elaborate preparation and presentation on the motion for a new trial, the obvious method of verifying the Ede version, by the telephone company records, was not resorted to.

Lastly it is claimed that the prosecution suppressed a ballistics report by the Police Department. Far from being suppressed, the report was subpœnaed and was in the courtroom at all times in common with all other reports made by police officers. When defense counsel wished to examine or use any of these reports, he asked for them and was immediately accommodated. He never asked for this report. The claim is that it should have been called to his attention.

The suppression by the prosecution of evidence favorable to an accusesd upon request violates due process if the evidence is material to guilt or punishment, irrespective of the good faith of the prosecutor (*Brady* v. *Maryland,* 373 U. S. 83). Although the requirement of a request for the suppressed testimony has not to our knowledge been obviated by any subsequent expression of the Supreme Court, we prefer not to place our decision on the absence of any request in the claimed instances of suppression. We have noted that this requirement has been stated not to be a *sine qua non* (*United States* v. *Wilkins,* 326 F. 2d 135). On the other hand, we cannot believe that it is the law that every statement by a person interviewed by the District Attorney must be disclosed to the defense regardless of its materiality or probable veracity merely because the defense, after the event, claims that it might have made use of it. Mr. Justice WHITE, concurring in *Brady* (*supra,* p. 92) stated specifically: " I * * * would not cast in constitutional form a broad rule of criminal discovery." Nor do we believe that any such all-embracing rule has been enunciated. It must be apparent that in a many faceted investigation such as the instant prosecution, a great many persons will necessarily be interviewed. Avenues of investigation will prove to be dead-end streets. We have not yet reached the point where we substitute for the adversary system a process whereby the defense is to be kept advised of every step taken by the prosecution. Rather, we think the true test of what must be disclosed is that of simple fairness. The opposing considerations were well expressed by Judge HASTIE: " It seems likely that many situations will arise in which a prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false. But there are other circumstances in which a prosecutor must, or certainly should know that even testimony which he honestly disbelieves is of a type or from a source which in all probability would make it very persuasive to a fair minded jury." (*United States* v. *Dye,* 221 F. 2d 763, 769.) While a matter of essential fairness cannot be fixed by express rule or be the subject of precise definition, a brief review of what has been considered

unfair may make decision more uniform. In *Brady (supra)*, the evidence suppressed was one of three confessions made by a codefendant. In the two supplied he charged the defendant with firing the fatal shot, in the one withheld he admitted he fired it; in *United States ex rel. Almeida* v. *Baldi* (195 F. 2d 815), the caliber of the fatal bullet, differing from the caliber of the defendant's revolver, was concealed; in *United States* v. *Wilkins (supra)* and in *Wilde* v. *Wyoming* (362 U. S. 607), the testimony of two reputable eyewitnesses to a robbery to the effect that the defendant was not one of those participating was withheld; in the *Dye* case *(supra)* where the intoxication of the defendant was offered to show absence of intent, the arresting officer who had stated he believed the defendant to have been intoxicated was not called; in *United States ex rel. Montgomery* v. *Ragen* (86 F. Supp. 382) in a prosecution for rape, the report of an examining physician that the complainant had not been violated was suppressed. Examples could be multiplied, but these are believed to be typical. In two of the cases the reputable character of the witnesses was an important factor in determining that the practice was unfair. In the others, it was the controlling nature of the evidence.

Applying these rules to the alleged instances in the case at bar, we find that in the Ede testimony and the ballistics report there was no ground for even a claim of suppression. As regards Bennett and McNair, even if suppression could be found — which we doubt — the evidence was of such a tenuous nature that even the fairest minded prosecutor would not feel called upon to advise the defense. As for the Generazio testimony, this was clearly not from a source that a jury would be expected to credit. And in view of defendant's knowledge of the witness and that she had some connection with the case, the prosecutor was entitled to assume that any further disclosure would be requested. In no case that has come to our attention has the failure to call attention to evidence whose bearing on the issue of guilt been so remote and speculative been considered suppression.

There is also a claim that the District Attorney sat by while testimony was given that he knew to be false. It appears that twice during the preparation of the case Miss Kendal told the District Attorney that she would not testify that the defendant admitted the killing or that she saw the body in the trunk, and that her previous statements to this effect were untrue. Upon completion of her direct testimony, the District Attorney disclosed these incidents to the defense. Both she and the detectives present were cross-examined as to them. As to the first

recantation, no question is raised. It appears that the second recantation immediately followed an interview in which the Kendal and Generazio women were brought together. In the interview Miss Kendal became incensed at Mrs. Generazio, berated her and finally refused to remain in the room with her. The latter was excused and left. Miss Kendal then turned her wrath upon the detective, accusing him of seeking witnesses to discredit her and using Gestapo methods. He was excused and then she made her recantation. The question was asked as to who was present at the interview. Miss Kendal said she did not remember. The detective named the Assistant District Attorney but did not name Mrs. Generazio. Technically speaking, this testimony was correct, because at the time of the recantation she was not present. But it was not an accurate statement as to those present at the interview.

The principles behind the rules governing the situation where the District Attorney sits by and allows false testimony to be given and that where the prosecutor suppresses exculpatory evidence are the same. The principle is still that the defendant is entitled to a fair trial without trickery or overreaching by the prosecution, and the question is whether the District Attorney's conduct negated that right (*People* v. *Savvides,* 1 N Y 2d 554). Without a showing that the questioned testimony was false to the knowledge of the prosecution, no unfairness is established (*People* v. *Fanning,* 300 N. Y. 593).

The cross-examinations in which the alleged false testimony was given were not directed to the point on which the testimony was inaccurate. As regards the Kendal woman, the efforts of counsel were to show that the words of the recantations amounted to unequivocal admissions that the earlier statements were in fact false. This was followed by an endeavor to obtain an admission that the recantation represented the fact. With the detective the effort was to show that the recantation was not, as Kendal claimed, the consequence of sympathy for the defendant and remorse for the destruction of his family life. In a way counsel proved his point — that the motive given was false — but he also established a reasonable motive, annoyance with the police investigators. The significant point is that who was present at the interview was not emphasized and actually received only cursory attention. The matter of the recantations was only a small part of extended cross-examinations. When it is considered that the District Attorney participated in a very large number of interviews, his failure to correct what appeared to be an incidental fact in regard to one of them is not shown to be deliberate nor an effort to overreach the defense. This view

is strengthened by the fact that the whole subject of the recantations was revealed to the defense by the same Assistant District Attorney and the defense without that revelation was entirely without information of it. And the revelation was made in a highly ethical manner which drew the express approval of defendant's trial counsel.

We conclude that defendant, on this alleged specification of error, was not deprived of a fair trial. In so doing we are not unaware of the decision in *People* v. *Robertson* (12 N Y 2d 355) where, on an application for *coram nobis* relief, a new trial was granted. In that case a police officer unwittingly gave false testimony which a majority of the court found could have had crucial effect on the verdict of the jury. The ruling was made despite the fact that the District Attorney was unaware of falsity of the evidence. The holding, namely, that an unfair trial results where police, an arm of the prosecution, give false testimony of a material character without regard to the knowledge of the prosecution, has no application to the facts here presented.

The judgment of conviction should be affirmed.

BREITEL, J. P., RABIN, EAGER and WITMER, JJ., concur.

Judgment of conviction unanimously affirmed.