**UNITED STATES of America ex rel. Mark FEIN, Petitioner-Appellant,**

**v.**

**John T. DEEGAN, as Warden of Sing Sing Prison, State of New York, Respondent-Appellee.**

**No. 303, Docket 31921.**

United States Court of Appeals Second Circuit.

Argued Feb. 9, 1968.

Decided March 24, 1969.
Certiorari Denied June 2, 1969.
See 89 S.Ct. 1997.

O. John Rogge, Milton C. Weisman, Richard Sheinberg, Abraham L. Wax, Arthur Keller, Weisman, Celler, Allan, Spett & Sheinberg, New York City, for appellant.

Eric A. Seiff, Sp. Counsel to Dist. Atty., H. Richard Uviller, Asst. Dist. Atty., Frank S. Hogan, Dist. Atty., New York County, for appellee.

Before WATERMAN and FEINBERG, Circuit Judges, and BARTELS, District Judge.*

BARTELS, District Judge:

Following his conviction for second degree murder in the State Supreme Court, Mark Fein, the appellant, moved for a new trial asserting a number of claims. Those raising the most serious questions are (i) the suppression by the prosecution of the name and story of Dagmar Finch Generazio; (ii) the admission into evidence, without a hearing, of a chair allegedly obtained by means of an illegal search and seizure; and (iii) the use of a Blue Ribbon Jury at appellant's trial.

After an extensive hearing [1] by the trial court (Culkin, J.), the motion was denied. The Appellate Division of the State Supreme Court (24 App.Div.2d 32, 263 N.Y.S.2d 629 (1st Dept.1965)) unanimously affirmed both the judgment of conviction and the denial of the appellant's motion for a new trial and that decision in turn was affirmed by the Court of Appeals (Fuld, J., dissenting), 18 N.Y.2d 162, 272 N.Y.S.2d 753, 219 N.E.2d 274 (1966). The appeal to the

---

* Of the Eastern District of New York, sitting by designation.

[1.] Gloria was not available for this hearing and there is no showing that she would be available for any other hearing.

United States Supreme Court was dismissed for want of jurisdiction (Douglas, J., dissenting) and the petition for a writ of certiorari denied. Then followed Fein's application for a writ of *habeas corpus* in the United States District Court for the Southern District of New York, which was denied by Judge Palmieri (United States of America ex rel. Fein v. Deegan, 359 F.Supp. 298). In effect, we are reviewing a State court record which has been reviewed by 12 State court judges and affirmed by 11 of them.[2]

The story is a sordid one, resulting on October 10, 1963 in the murder of Rubin Markowitz, a one-time grocery clerk and bookmaker. Markowitz was last heard from by a client at 4 P.M. that same day and his death occurred after that hour.

Fein owed Markowitz $7,000, which he had lost betting against the Los Angeles Dodgers in the 1963 World Series. He made an appointment with Markowitz to pay the $7,000 and at the same time he made arrangements with a friend to pay Markowitz approximately $16,690 owed to Markowitz by that friend and another. For this purpose Fein was given $4,690 in cash and a $12,000 promissory note payable to Fein. The killing permitted Fein not only to write off his own debt but ultimately to pocket the $16,690 furnished by the friend.

The State's chief witness against Fein was Gloria Kendal, an admitted prostitute and the some time mistress of Fein. She testified that Fein telephoned her to come to his apartment (which he leased in the name of "Weissman" for his extramarital activities) between 5:30 and 5:45 P.M. on October 10, 1963. Before responding to this distress signal, Gloria left a message with another prostitute who remained in her apartment, one Sandra Ede. This message was addressed to Geraldine Boxer (Geri), whose custom was to meet daily with Gloria for light supper before each attended their respective evening classes. Gloria then taxied the ten blocks to Fein's secret lodging. When she arrived before 6 P.M. at Fein's apartment "He was very flushed. His hair was messed, and his eyes were enormous." Fein then told her that he had shot his bookmaker Ruby and asked her to assist him in disposing of the body which he had stuffed into a steamer trunk. Gloria testified that she "saw part of an arm, and some new clothes line, and some white material that looked like a shirt." Responding to his request, Gloria called one David Broudy, an unemployed taxi cab driver (who did not know Fein), who immediately proceeded by car to the "Weissman" apartment. In the meantime Geri drove to Gloria's apartment and was directed by Sandra Ede over the intercom to proceed to the "Weissman" apartment pursuant to Gloria's instructions.

Both Broudy and Geri eventually arrived at the "Weissman" apartment. In answer to a question by Broudy, Fein stated that while he was paying his bookmaker "somebody burst in * * * shot this man and scooped up the money and left." He also told Broudy that he had lined the bottom of the trunk with "some canvas bags" to prevent blood leakage. Since the trunk would not fit into either Broudy's car or Geri's car, Fein arranged for the rental of a station wagon. After he and Gloria picked up the vehicle, Fein and Broudy loaded the trunk into it and Fein gave the keys to Broudy and departed for a dinner date with his wife and friends.

Thereafter the two women and Broudy drove the station wagon to Gloria's apartment and double parked while Gloria entered the apartment, had a drink with Sandra Ede and obtained some money to pay Broudy for his trouble. Half an hour later she returned to the car where Broudy and Geri were waiting. Thereafter the three disposed of the trunk in the Harlem River. During the weeks that followed Gloria

---

2. If we add the State trial judge and the Federal district judge, 13 judges have approved the record.

and Broudy, in answer to Fein's plea for help, attempted to obliterate all evidence that might have associated Fein or the crime with the "Weissman" apartment by filling and painting holes in the floor and wall, destroying the carpet and removing furniture and furnishings.

### The Alleged Suppression of the Testimony of Dagmar Finch Generazio

One of the chief grounds for Fein's application for *habeas corpus* was the alleged suppression of the testimony of one Dagmar Finch Generazio (Dagmar), a prostitute associate of Gloria, which Fein claims to be exculpatory. There are two phases of Dagmar's testimony, the first relates to an alleged phone call from Gloria to Dagmar and the story Dagmar told the prosecutor pertaining to that call, and the second relates to Gloria's second recantation on September 28, 1964, three weeks before the trial. Dagmar's post-trial testimony was to the effect that Gloria had telephoned her on the day of the murder [3] before 4 P.M. at Gail Weiner Tracy's apartment on 64th Street, where she was living at the time. In this conversation Gloria tried to induce Dagmar to assist her in finding a car to move a heavy box but was unsuccessful. The defense claims that the testimony of this telephone call before 4 P.M. would have been not only damaging to Gloria's credibility but might have suggested that Gloria, rather than Fein, was responsible for the murder.

Dagmar's estranged husband corroborated his wife's account to the police by testifying at the hearing that his wife had said to the detectives that the call was "in the afternoon of October, this particular time * * * She did say it was in the afternoon." Gail Tracy testified that the phone call was made shortly after 3 P.M. But prior to this testimony at the hearing Gail testified that she had called Dagmar a liar when

Dagmar stated that such a phone call had been made because, according to Gail, Dagmar had not been in Gail's house for six or seven months. She also admitted that, except on one post-trial occasion, she had flatly denied the occurrence of any such call and did so on one occasion in Dagmar's presence.

Both Assistant District Attorney Vincent Dermody and Detective Leman testified that Dagmar had never said that the telephone call was made earlier than between 6 and 7 o'clock. At one time she told Detective Leman that "maybe it was eight o'clock or nine o'clock." In an effort to fix the time more precisely she said "All I know is that it was dark out, and when I entered the building the dry cleaning man was getting ready to close his store." On a second visit to the District Attorney's office, Dagmar related in front of Gail Tracy the story of receiving a phone call at her house some time after or between 6 and 7 P.M. Gail Tracy called Dagmar a liar stating that Dagmar never received a call on Gail's telephone at any time.

In his decision on the post-trial motion, the state trial judge rejected Dagmar's testimony as well as that of her husband and of Gail Tracy as being unworthy of belief, and denied the motion for a new trial. As to Dagmar, the judge specifically found as follows:

"Having seen and heard this witness, I reject her testimony as totally unworthy of belief. While under oath at the hearing, she strained with tireless effort to avoid telling the truth, whether the examination covered her recorded criminal past, the date of her marriage, the frequency which the police telephoned her, or the reaction of Gail Weiner Tracy, a witness called by the prosecution after she submitted a sworn question and answer on behalf of the defendant, upon a certain confrontation. The foregoing are all measurable standards, but of no greater import than the impression

---

3. As a matter of fact, the prosecutor and the detective testified that she said the phone call was made in late September or early October.

this witness created when set against less tangible marks. I find that she never told the prosecution of receiving a call *on any afternoon.* I further find that insofar as this witness' credibility is concerned, her story that she received any call from Mrs. Lazarus on the day, or month, of the killing does not warrant belief." (Emphasis added.)

The state judge, after hearing all the witnesses, thus found that Dagmar never told the prosecutor of a call received between 3 and 4 P.M.

 In United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946), the Supreme Court held that it was not the province of a federal court of appeals in reviewing orders granting or denying motions for a new trial, to intervene on the ground of erroneous findings of fact unless it clearly appears that such findings are unsupported by any evidence. As the court observed (p. 113, 66 S.Ct. p. 467):

"While a defendant should be afforded the full benefit of this type of rectifying motion, courts should be on the alert to see that the privilege of its use is not abused. One of the most effective methods of preventing this abuse is for appellate courts to refrain from reviewing findings of fact which have evidence to support them. The Circuit Court of Appeals was right in the first instance, when it declared that it did not sit to try de novo motions for a new trial."

 Where the State Court has made a full and fair evidentiary hearing with express findings of fact, the district court may "and ordinarily should, accept the facts as found in the hearing" (Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963); see, Midgett v. Warden, Maryland State Penitentiary, 329 F.2d 185 (4th Cir.1964); Durham v. Haynes, 258 F.Supp. 452 (E.D.Mo., N.D.1966), aff'd, 368 F.2d 989 (8th Cir. 1966), *cert. denied,* 390 U.S. 959, 88 S.Ct. 1054, 19 L.Ed.2d 1154 (1968)). This principle

was codified in 28 U.S.C.A. § 2254(d), which provides that the determination of fact of the State court in a *habeas corpus* proceeding, subject to certain other provisos not here present, "shall be presumed to be correct," unless the "factual determination is not fairly supported by the record." Since we do not believe that it can be said that the findings of the State court are not fairly supported by the record and since that hearing was full and fair, we must, therefore, accept at least the finding that Dagmar "never told the prosecution of receiving a call on any afternoon." The State also argues with force that since the State judge also found incredible Dagmar's story that she received *any* call from Gloria on the day of the killing, that should end this phase of the appeal. However, Fein points out that the prosecutor conceded that Dagmar made a statement to him of a 6 to 7 P.M. telephone call, which is not in the "afternoon." While this is not a concession that Dagmar actually did receive a call, it does bear on the prosecutor's state of mind and his alleged "unfairness."

 We turn then to the assumption that Dagmar did tell the prosecutor of a 6 to 7 P.M. telephone call. It is argued that such information was vitally material to the defense because from such a call the jury could draw an inference damaging to Gloria. The prosecution witnesses testified that when Broudy, Geri and Gloria drove the station wagon containing the trunk from the "Weissman" apartment, they stopped at Gloria's apartment between 6 and 7 P.M. Fein suggests that had the prosecutor disclosed that he had evidence indicating that Gloria had, at the time she went upstairs to her own apartment, telephoned Dagmar in an attempt to borrow a car to remove a box, the jury might have inferred that the decedent's body was not in the trunk at all but was elsewhere awaiting removal; thus the entire substance of Gloria's story that it was at Fein's request that she had become involved in disposing of the body

of the man murdered in the "Weissman" apartment was false. A major difficulty with this theory is that there is no evidence from any witness that Markowitz's body was anywhere except in the station wagon trunk at the time. Broudy testified that Fein said that the body was in the trunk, Gloria testified that she had seen the body in the trunk, and Broudy and Gloria testified that they helped Fein to remove the damaging evidence from the "Weissman" apartment. Moreover, it was reasonable for the prosecution to conclude that there was no major inconsistency between Gloria's account and Dagmar's statement that Gloria made a phone call to Dagmar between 6 and 7 P.M., because the call could have been made by Gloria from the "Weissman" apartment (rather than from Gloria's apartment) at the same time Gloria called Broudy (which was around 6 P.M.) in her effort to get a car to remove the trunk. From the record it appears that the prosecutor had reason to feel unsure as to whether Dagmar was telling the truth. Dagmar had mentioned that she received a call from Gloria while at Gail Tracy's apartment, but Mrs. Tracy had denied this to the prosecution before the trial. It is true that Dagmar's statement might have been used to attack Gloria's credibility but, as indicated below, defense counsel was adequately armed at trial and attacked her credibility thoroughly. Under all the circumstances, even giving credence to Dagmar's statement that she had informed the prosecution about a phone call between 6 and 7 P.M. does not vest it with the materiality essential to a finding of prosecutorial suppression.

The second phase of Dagmar's potential testimony, allegedly suppressed, involved Gloria's second recantation on September 28th. Dagmar testified that Gloria had twice asked her to "stick with me." Finally there was a confrontation between Dagmar and Gloria at the District Attorney's office when Dagmar related the story that Gloria had called Dagmar at Gail's apartment between 6 and 7 P.M. Gloria denied the call and began screaming and yelling that Detective Leman was trying to induce people to lie about her. Detective Leman escorted Dagmar from the room and Gloria demanded to see her lawyer. After Dagmar and Leman left, Gloria recanted her story for the second time, only to return to the original story given at the trial. The prosecutor advised defense counsel of both recantations but not of the confrontation with Dagmar prior to the recantation. In their testimony neither Gloria nor Detective Leman mentioned Dagmar's presence at the meeting prior to the recantation. Based upon these circumstances, the defense has accused the prosecution of countenancing false testimony.

Gloria and Detective Leman had conflicting explanations at the trial of the case as to the cause of the second recantation. In each case their testimony was predicated upon their respective opinions as to the cause. It cannot be said whether either was right or wrong. In all events, Dagmar was not present at the time of the recantation although she was present at the meeting. The questions posed by the defense itself were ambiguous. The Appellate Division held that who was present at the interview was not emphasized and the question did not clearly indicate that presence at the interview rather than presence at the time of recantation, was the information sought. The Court of Appeals held that the record amply sustained the lower court's finding that the testimony was not in fact false or perjurious. We are compelled to agree. The record discloses that materiality of Dagmar's confrontation under the circumstances is highly speculative and fails to reveal any evidence of its suppression.

Dagmar's testimony did not bear directly upon the guilt or punishment of Fein. At most, it pertained to Gloria's credibility, provided one could bridge the gap of Dagmar's incredibility. Gloria's credibility, however, had been relentlessly attacked by an exhausting and punishing cross-examination in which her

recantations and background were thoroughly explored. Even the prosecutor in his summation described her, among other things, as "notorious," "a moral leper," and "an old whore." Nevertheless, the jury believed enough of Gloria's testimony, as corroborated by Broudy and Geri, to convict Fein.

Fein claims that he made a request to the prosecutor for Dagmar's whereabouts, which poses the question of prosecutorial suppression. It is admitted that during the course of the trial the defense was aware that Dagmar had told the prosecutor that she had received a phone call from Gloria on the murder day in an attempt to borrow a car. In fact, the defense counsel knew about Dagmar, as appears from his cross-examination of Geri Boxer, when he inquired as to Geri's acquaintanceship with Dagmar. In a hallway conversation during the trial, William J. Whelan, defendant's investigator and a former policeman, informed Detective Leman that the defendant knew of the phone call and asked whether the prosecutor was going to place Dagmar on the stand, to which Detective Leman replied that he did not know. When Detective Leman asked Whelan if the latter had called Dagmar's mother in Baltimore, Whelan requested the mother's phone number, to which Detective Leman replied "I am not at liberty to give it to you." Whelan stated that he "did not expect that he would give it to me." In other words, Whelan as a former policeman knew that the request was not made to the proper source and that a detective ordinarily is not at liberty to furnish information to the defense without the authority of the prosecutor. Yet the defense neither pursued the matter nor made an application to the court for Dagmar's whereabouts. Mr. Blinder, one of the defendant's counsel, stated at the post-trial hearing that he did not pursue the matter because he believed that if Dagmar were important to the defendant's case, the prosecutor would inform him of that relevance.

The Court of Appeals found that there was not only no request for Dag-

mar's full name, address or telephone number but also no indication that the defense could not locate her. If the request was to flag the importance of the evidence for the defense and accordingly impose upon the prosecutor a duty to make a careful check of his files, it was not too much to require that such request be made to someone in authority rather than to a police detective whom the defendant's own investigator did not believe would supply the information.

In United States v. Keogh, 391 F.2d 138 (2d Cir.1968), Judge Friendly classified the law as to prosecutorial suppression of evidence into three categories: (1) deliberate bad faith suppression for the very purpose of obstructing the defense, or the intentional failure to disclose evidence whose high probative value to the defense could not have escaped the prosecutor's attention; (2) deliberate refusal to honor a request for evidence where the evidence is material to guilt or punishment, irrespective of the prosecutor's good faith or bad faith in refusing the request; and (3) where suppression was not deliberate and no request for evidence was made, but where hindsight discloses that it was so material that the defense could have put the evidence to not insignificant use (pp. 146–148). The best that can be said for appellant's point is that the action of the prosecutor in this case arguably fell within the second category of a deliberate refusal to honor a request for evidence that is material to guilt or punishment. But in our view, it would be unfair and inequitable to charge the prosecutor with the responsibility for any oral request which was made by an employee of the defendant, such as an investigator, to an employee of the prosecutor, such as a detective. Aside from that failure, we find it hard to evaluate Dagmar's testimony as material. The third category set forth in *Keogh* refers to an unintentional suppression of evidence without a request where the evidence was so material that "the defense could have put the evidence to not insignificant use." But in those cases

"the standard of materiality must be considerably higher." As Judge Friendly remarked (p. 148): "To invalidate convictions in such cases because a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties." Dagmar's testimony was peripheral in nature and only obliquely affected Gloria's credibility. To say the least, it is doubtful whether such evidence satisfied the standard of materiality required by the second category. Certainly it did not satisfy the standard of materiality in the third category. It seems to us that no stretching can force the testimony of Dagmar into the factual pattern of prosecutorial suppression of material evidence, condemned in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir. 1964).

▇▇▇ It is appropriate to note that upon an application for a new trial based upon newly discovered evidence, due diligence is an essential factor. See, New York Code of Criminal Procedure, § 465(7) and cases cited thereunder; see also, United States v. Costello, 255 F.2d 876 (2d Cir.1958), *cert. denied,* 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958), *reh. denied,* 358 U.S. 858, 79 S.Ct. 16, 3 L.Ed.2d 93 (1958); Kyle v. United States, 297 F.2d 507 (2d Cir. 1961), *cert. denied,* 377 U.S. 909, 84 S.Ct. 1170, 12 L.Ed.2d 179 (1964); United States v. Capece, 287 F.2d 537 (2d Cir.1961), *cert. denied,* 368 U.S. 847, 82 S.Ct. 78, 7 L.Ed.2d 45 (1961); United States v. Lombardozzi, 343 F.2d 127 (2d Cir.1965), *cert. denied,* 381 U.S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702 (1965). And such application will not be granted if the evidence is merely impeaching. People v. Eng Hing, 212 N.Y. 373, 386, 106 N.E. 96 (1914); Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); United States v. Aguillar, 387

F.2d 625 (2d Cir.1967). To relieve the defendant of his duty of due diligence, the evidence of prosecutorial suppression should be clear and unequivocal. A half-hearted and casual inquiry made by one subordinate to another subordinate should not shift the responsibility to the prosecutor. The prosecutor made many disclosures to the defense and there is nothing in the record which suggests that his conduct, as well as that of his staff, under difficult circumstances did not amply satisfy the fundamental concepts of due process necessary in order to provide the defendant with a fair trial.

### The Admission into Evidence of the Chair

The second relevant ground for Fein's complaint is the admission into evidence of a chair containing a speck of blood, allegedly seized in violation of the Fourth and Fourteenth Amendments. When the prosecutor offered the chair for identification, the defense counsel objected at the bench in these words:

"If this furniture purports to be furniture that was in the apartment, Apartment 5-B, which is the apartment in question over here; and if that apartment was entered into without a search warrant; or in the alternative, since we have already heard some furniture had been stored in some furniture storage warehouse, if this furniture had been secured from this furniture storage warehouse without the proper legal warrant or proper legal authorization, I object to it; and I shall move to suppress this evidence."

The chair was marked for identification upon the condition that the defense was not deemed to have waived its right to question the legality of the evidence on a motion to suppress later. Eight days later, during direct examination, Gloria testified that Fein had requested her to remove all the furniture, including the chair, from the 63rd Street apartment, saying: "Get rid of all the furniture in

the apartment now, and get rid of the rug; get rid of everything." Gloria placed the chair in a storage warehouse under a pseudonym. The chair was received in evidence over the general objection by the defense, counsel reminding the court of a discussion about the chair at the bench a few weeks prior thereto. The trial court stated: "Yes, I am familiar with that; but under the testimony here, the objection is overruled."

At the post-trial hearing the State court stated that there was no evidence to support the counsel's conjecture that the chair was illegally seized. It added that after the witnesses for the prosecution testified, the defense did not seek a *voir dire* upon the ground of illegal search and seizure and it accordingly found that the chair had been abandoned by the defendant. The Appellate Division stated that the speck of blood on the chair was so small that it could not be typed and that the chair could be disregarded as proof that the homicide took place in the apartment. The Court of Appeals found that the defendant abandoned his interest and retained no rights in the chair which could be breached by an illegal seizure. The District Court found that the police had procured the chair stored in a warehouse in the name of "Weissman" without a search warrant, but that Fein had given Gloria authority to dispose of the chair and had abandoned it just as if he had thrown it in a public wastepaper basket.

■ Defendant claims that he was deprived of his fundamental constitutional rights under the authority of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), because he was denied a hearing under the New York Code of Criminal Procedure § 813-c in the absence of the jury upon the issue of abandonment. The particular facts in this case do not pose the attack upon the rights of the accused presented in Jackson v. Denno, *supra*. Assuming that Fein had properly preserved his right under § 813-c of the New York Code of Criminal Procedure, the court was justified in proceeding without such a hearing. Defense counsel's objection was based upon an "if" but that "if" was rendered meaningless by Gloria's subsequent testimony.

While the right to a suppression hearing is not a technical device or a narrow procedural requirement, nevertheless it is a right that must be asserted upon unambiguous grounds. Although the chair was taken by a warrantless search from the warehouse, counsel for Fein knew, after eight days of testimony, that if Fein had any right to a separate suppression hearing, it would have to be asserted upon the ground that Fein had a property interest in the chair. Counsel was an experienced and skillful defense attorney and he knew how to focus attention upon his client's rights. Instead of making a claim of property interest in the chair to the court (which he could have asserted outside of the hearing of the jury), he was content to rely upon his earlier objection of an illegal search and seizure predicated upon the hypothesis that the chair was in the "Weissman" apartment at the time of the search which he knew at the time of the second objection was not the fact. It was then his duty to come forward with an assertion of some specifics to show that he had a standing to demand a § 813-c hearing. This he did not do. Under such circumstances, he cannot wait until after the trial and then claim that he was deprived of his rights. Cohen v. United States, 378 F.2d 751 (9th Cir. 1967), *cert. denied*, 389 U.S. 897, 88 S. Ct. 217, 19 L.Ed.2d 215 (1967); United States v. Phillips, 375 F.2d 75 (7th Cir. 1967), *cert. denied*, 389 U.S. 834, 88 S. Ct. 40, 19 L.Ed.2d 95 (1967); People v. Solimine, 18 N.Y.2d 477, 276 N.Y.S. 2d 882, 223 N.E.2d 341 (1966); People v. Estrada, 28 A.D.2d 681, 280 N.Y.S.2d 825 (2d Dept. 1967); People v. DeVivo, 23 A.D.2d 793, 258 N.Y.S.2d 1013 (1st Dept. 1965); People v. Childers, 54 Misc. 2d 752, 283 N.Y.S.2d 336 (Sup.Ct.1967). Fein will not be heard to claim prejudice from the use of evidence arising

from a search and seizure in violation of the constitutional right of either Gloria or the warehouseman. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L. Ed.2d 668 (1960), reh. denied, 362 U.S. 984, 80 S.Ct. 1056, 4 L.Ed.2d 1019 (1960); Hester v. United States, 265 U. S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); United States v. Masterson, 383 F.2d 610 (2d Cir.1967), cert. denied, 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968), reh. denied, 391 U.S. 909, 88 S.Ct. 1650, 20 L.Ed.2d 425 (1968). One is compelled to infer that Fein's counsel failed to properly move at the trial not only because the evidence indicated that the chair had been abandoned and the result of his application would have been fruitless, but also because Gloria's damaging testimony with respect to the chair was at all events admissible, even though the chair might have been inadmissible.

### The Challenges to the Blue Ribbon Jury

The final serious question presented by this appeal involves a double-barreled attack on the special jury convened by the trial court under the New York blue ribbon jury statute, former New York Judiciary Law § 749–aa, repealed, 1965 New York Laws ch. 778, § 3. First Fein urges that New York's blue ribbon jury statute was unconstitutional because it resulted in a significant overrepresentation of persons from higher income groups with a corresponding underrepresentation of those from lower income groups. The argument that Fein was thus convicted by an unrepresentative jury presents difficult issues. The analogy is drawn to Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), and Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967), where a demonstration that members of a racial group were significantly underrepresented on

grand and petit juries was enough to make out a prima facie case of intentional discrimination and a denial of due process and of the equal protection of the laws. Those cases may be distinguishable but, in any event, it is more significant that what we are in effect being asked to do here is to overrule the decisions of the Supreme Court, sustaining by 5–4 vote the blue ribbon jury against constitutional attack, in Moore v. New York, 333 U.S. 565, 68 S.Ct. 705, 92 L.Ed. 881 (1948), and Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L. Ed. 2043 (1947), although that Court has not done so yet,[4] and even though the New York blue ribbon jury statute is no longer in effect. It is urged that those decisions would have been different had the Court then considered that the Sixth Amendment applied to the State; however, we believe that we are bound by these decisions until such time as the Court informs us that we are not.

In his reply brief, Fein for the first time also argues that the blue ribbon jury statute was unconstitutional on its face because its object was

"* * * to effect the exclusion * * * of all those individuals who had conscientious scruples against capital punishment. * * * Thus this statute assured the state of a jury whose members were partial to the prosecutor on the issue of guilt or innocence."

This argument in Fein's reply brief came after (and no doubt in light of) the grant of certiorari by the Supreme Court in Witherspoon v. Illinois, 391 U. S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In that case the Court held unconstitutional the imposition of the death penalty in cases where persons with scruples against capital punishment were excluded from jury service, a holding explicitly limited to death penalty cases and then only to sentence rather

---

4. In our own court, we would be overruling Vanderwyde v. Denno, 113 F. Supp. 918 (S.D.N.Y.1953), aff'd per curiam, 210 F.2d 105 (2d Cir. 1954), cert. denied, 347 U.S. 949, 74 S.Ct. 646, 98 L.Ed. 1096 (1954).

than conviction. *Id.* at 522–523, 88 S.Ct. 1770 n. 21; see Bumper v. North Carolina, 391 U.S. 543, 545, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The Court in *Witherspoon* did consider the argument that exclusion of jurors with scruples against capital punishment precludes an impartial trial on the issue of guilt. The majority there said, *id.* at 517–518, 88 S.Ct. at 1774:

> "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." [5]

While it is true that *Witherspoon* does hint, as the dissenters note, *id.* at 539, 88 S.Ct. 1770, that the law may change on a different record, the studies and reports cited to us are the same as those cited to the Court in *Witherspoon* and *Bumper*. Thus, a different result could not be supported on the present law. However, we do not even reach the question. As pointed out above, this part of the challenge to the blue ribbon jury statute was first made in this court. Consequently, there was not only no opportunity for the district court to evaluate the question, but Fein apparently has not exhausted his State court remedies by first making the argument raised here to the New York State courts. In these circumstances, we should refuse to pass on the claim without prejudice to Fein's subsequently making it to the State courts.

Appellant also claims that he is entitled to reversal because of other alleged prosecutorial suppression of evidence, denial of pretrial discovery and inspection, the effect of publicity, and certain statements made by the trial judge to the jury. These contentions were discussed and found to be without merit by Judge Palmieri in his opinion predicated upon the petition for the writ and the motion for a certificate of probable cause. We subscribe to his conclusions.

Upon the examination of the State court record, we find no violation of Fein's right to due process and a fair trial. Accordingly, we affirm the District Court's denial of the writ.

Judgment affirmed.

WATERMAN, Circuit Judge (concurring):

I find the dissenting opinion of Chief Judge Fuld of the New York Court of Appeals, 18 N.Y.2d 162, 177, 272 N.Y.S. 2d 753, 763, 219 N.E.2d 274 (1966), most persuasive. I, with him, believe that it is possible that the jury might have reached a different verdict if the testimony Dagmar Generazio gave at the post-trial hearing had been presented at the trial. Nevertheless, I recognize that petitioner was convicted in the New York state courts and not as a result of a federal prosecution, and as we are not therefore writing upon a clean slate I am willing to concur in the affirmance of the decision below.

It appears that before the state felony trial the defense knew of Dagmar's existence and of the possible importance of her testimony. The defense, despite this knowledge, did not exert itself to seek her out and interview her. This failure on its part to exercise a reasonable diligence in trial preparation should bar us in this collateral proceeding from ordering petitioner's release or ordering the grant of a new trial based upon truly newly discovered suppressed exculpatory evidence.

Even though the office of the prosecutor was in constant touch with Dagmar during crucial days of investigation and trial as shown by the records of the telephone company, I would not go so far as to hold that this interrogative surveillance requires us to overturn this state

---

5. Subsequently, the Court in Bounds v. Crawford, 393 U.S. 76, 89 S.Ct. 234, 21 L.Ed.2d 62 (1968), vacated the judgment in Crawford v. Bounds, 395 F.2d 297 (4th Cir. 1968) (*in banc*), which had accepted the argument urged to us, and remanded for reconsideration in light of *Witherspoon*.

court conviction upon a consideration of likely inferences that may be drawn from Dagmar's post-trial testimony. I agree with my brothers that we should not hold that there was a New York state prosecutorial suppression here; the defense was not unaware of Dagmar; she was not deliberately made unavailable to the defense; and no specific request was made by defense counsel for a direct lead to her whereabouts.